UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STANTON TANG,

              Plaintiff,                Case No. 1:24-cv-00616

v.                                Hon. Robert J. Jonker

NEXSTAR MEDIA INC.,         Magistrate Judge Ray Kent

              Defendant.          Oral Argument Requested

| | |
|---|---|
| Todd R. Knecht (P35362) | Richard W. Warren (P63123) |
| Knecht Law, PLC | OGLETREE DEAKINS, PLLC |
| *Attorneys for Plaintiff* | *Attorneys for Defendant* |
| 4999 N. Quail Crest SE | 34977 Woodward Avenue, Suite 300 |
| Grand Rapids, MI 49546 | Birmingham, MI 48009 |
| TEL: (616) 308-4716 | TEL: (248) 631-3679 |
| trknechtlaw@gmail.com | FAX: (248) 593-2603 |
| | richard.warren@ogletree.com |

## **DEFENDANT NEXSTAR MEDIA INC.'S MOTION FOR SUMMARY JUDGMENT**

      NOW COMES Defendant, Nexstar Media Inc., ("Defendant" or "Nexstar") by and through

its attorneys, Ogletree, Deakins, Nash, Smoak & Stewart, PLLC, and respectfully moves this Court

pursuant to Fed. R. Civ. P. 56 for an Order granting Defendant summary judgment on all claims

alleged in Plaintiff Stanton Tang's ("Plaintiff" or "Tang") Complaint (ECF No. 1).  Based on the

law and facts set forth in Defendant's accompanying Memorandum in Support, there are no

genuine issues as to any material fact, and Defendant is entitled to full judgment as a matter of

law.

      On August 21, 2025, counsel for Defendant corresponded in writing with counsel for

Plaintiff to attempt to obtain concurrence regarding the relief sought in this Motion, but such

concurrence was not granted.  Accordingly, Defendant respectfully requests that this Court grant

summary judgment to Defendant on all counts in addition to any further relief which the Court may deem just and proper.

Respectfully submitted,

*/s/ Richard W. Warren*
Richard W. Warren (P63123)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, PLLC
*Attorneys for Defendant*
34977 Woodward Avenue, Suite 300
Birmingham, MI 48009
TEL: (248) 631-3679
FAX: (248) 593-2603
Dated: August 22, 2025           richard.warren@ogletree.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STANTON TANG,

              Plaintiff,                       Case No. 1:24-cv-00616

v.                                      Hon. Robert J. Jonker

NEXSTAR MEDIA INC.,              Magistrate Judge Ray Kent

              Defendant.                   Oral Argument Requested

---

| | |
|---|---|
| Todd R. Knecht (P35362) | Richard W. Warren (P63123) |
| Knecht Law, PLC | OGLETREE DEAKINS, PLLC |
| *Attorneys for Plaintiff* | *Attorneys for Defendant* |
| 4999 N. Quail Crest SE | 34977 Woodward Avenue, Suite 300 |
| Grand Rapids, MI 49546 | Birmingham, MI 48009 |
| TEL: (616) 308-4716 | TEL: (248) 631-3679 |
| trknechtlaw@gmail.com | FAX: (248) 593-2603 |
| | richard.warren@ogletree.com |

---

**BRIEF IN SUPPORT OF DEFENDANT NEXSTAR MEDIA INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................................................ii

I.    INTRODUCTION ....................................................................................................... 1

II.   STATEMENT OF UNDISPUTED FACTS ............................................................... 2

    A.    Tang's Employment with Nexstar and Nexstar's Standards Guide............................ 2

    B.    Fox and Tang Issue the Internal Memo and Lose the Trust of the Newsroom............ 3

    C.    Internal and External Responses to the Internal Memo ................................................ 5

    D.    Nexstar Investigates the Internal Memo and Terminates Four Employees ................. 7

    E.    Tang Files Suit Following Third-Party Publications Regarding the Internal Memo.... 9

III.  LAW AND ARGUMENT ........................................................................................... 10

    A.    Nexstar Did Not Defame Tang as a Matter of Law ..................................................... 10

        1.    Plaintiff has failed present any statements by Nexstar that were false and defamatory about him ......................................................................................... 11

        2.    All other allegedly defamatory statements identified by Plaintiff were made by third parties, not by Nexstar ........................................................................ 16

        3.    Plaintiff cannot establish defamation by implication .......................................... 18

    B.    Plaintiff's Defamation Per Se Claim is Not Actionable ............................................. 20

    C.    Nexstar Is Not Liable for False-Light Invasion of Privacy........................................ 21

    D.    Nexstar Did Not Violate the Bullard-Plawecki Employee Right to Know Act.......... 23

IV.   CONCLUSION............................................................................................................ 25

CERTIFICATE OF COMPLIANCE ............................................................................... 26

CERTIFICATE OF SERVICE ......................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Andrews v. Fixel Law Offices, PLLC*,
    2015 Mich. App. LEXIS 757 (2015) ......................................................................12

*Cambridge Dental, LLC v. JPMorgan Chase Bank N.A.*,
    2020 U.S. Dist. LEXIS 226908 (E.D. Mich. Dec. 3, 2020) ....................................18

*Daneshvar v. Kipke*,
    266 F. Supp. 3d 1031 (E.D. Mich. 2017) ...............................................................21

*Edwards v. Detroit News, Inc.*,
    322 Mich. App. 1, 910 N.W.2d 394 (Mich. Ct. App. 2017) ...................................10

*Found. For Behavioral Res. v. W.E. Upjohn Unemployment Tr. Corp.*,
    332 Mich. App. 406 (2020) .....................................................................................22

*Furby v. White*,
    7 Fed. Appx. 306 (6th Cir. 2001) ............................................................................25

*George v. Senate Democratic Fund*,
    No. 253202, 2005 WL 102717 (Mich. Ct. App. May 3, 2005) ...............................21

*Ghanam v. Does*,
    303 Mich. App. 522 (2014) .....................................................................................17

*Hawkins v. Mercy Health Servs., Inc.*,
    230 Mich. App. 315 (1998) .....................................................................................19

*Hawthorne-Burdine v. Freedman*,
    2018 Mich. App. LEXIS 1684 (2018) .....................................................................22

*Henderson v. Walled Lake Consol. Schools*,
    469 F.3d 479 (6th Cir. 2006) ..................................................................................18

*Hieber v. Oakland Cnty.*,
    136 F.4th 308 (6th Cir. 2025) .................................................................................20

*Ireland v. Edwards*,
    230 Mich. App. 607 (1998) .....................................................................................16

*Kendall v. Integrated Interiors*,
    2009 Mich. App. LEXIS 2151 (2009) .....................................................................25

*Lakin v. Rund*,
   318 Mich. App. 127; 896 N.W.2d 76 (Mich. Ct. App. 2016)................................21

*Ledl v. Quik Pik Food Stores, Inc.*,
   133 Mich. App. 583; 349 N.W.2d 529 (1984)..........................................16

*McMannon v. Redford Charter Twp.*,
   273 Mich. App. 131 (2006)...............................................................24

*Mitan v. Campbell*,
   474 Mich. 21; 706 NW2d 420 (2005).....................................................16

*Nehls v. Hillsdale Coll.*,
   65 F. Appx 984 (6th Cir. 2003)............................................................20

*Puetz v. Spectrum Health Hosps.*,
   324 Mich. App. 51 (2018)..................................................................21

*Reighard v. ESPN, Inc.*,
   341 Mich. App. 526 (2022).......................................................18, 19, 20

*Sarkar v. Doe*,
   318 Mich. App. 156 (2016).................................................................17

*Scuderi v. Monumental Life Ins. Co.*,
   344 F. Supp. 2d 584 (E.D. Mich. Nov. 9, 2004)......................................23

*Thomas M. Cooley Law Sch. v. Doe*,
   300 Mich. App. 245 (2013)................................................................17

*Zsigo v. Hurley Med. Ctr.*,
   475 Mich. 215 (2006)........................................................................18

**Statutes**

MCL § 423.505........................................................................................23, 25

MCL § 423.506.............................................................................................23

MCL § 600.2911(2)(a)....................................................................................20

**Treatises**

Prosser & Keeton, Torts (5th ed, 1988 Supp), § 116, p 117........................19

## I.   <u>INTRODUCTION</u>

The record evidence in this matter is entirely devoid of any defamatory statements published by Defendant Nexstar Media Inc. ("Defendant" or "Nexstar") about Plaintiff Stanton Tang ("Plaintiff" or "Tang") and Tang cannot establish that Nexstar maliciously cast him in a false-light or violated the Bullard Plawecki Employee Right-to-Know Act ("ERKA"). It is undisputed that Nexstar made no statements identifying Tang or attributing negative characteristics to him. Finally, Tang's attempts to claim that his June 2023 Memo complied with Nexstar policy is undermined by his admission that Nexstar is the only party authorized to interpret its own policies.  This shatters Tang's claims.

In June 2023, Tang directed his Assistant News Director Amy Fox ("Fox") to draft and disseminate an ill-conceived internal memorandum seeking a change in news coverage of Pride Month events to satisfy conservative viewers, which was not consistent with Nexstar's journalism standards. Nexstar terminated Tang on the basis that he had lost the trust of the employees in the newsroom and had violated Nexstar's standards by allowing a special interest group to impact news coverage. After one of Tang's subordinates leaked the internal memorandum to the press, a host of third-party news agencies unaffiliated with Nexstar began to report stories about the internal memorandum and Tang, with some of those third parties referring to Tang as "anti-gay" and "bigoted." For reasons which are still unclear to this day, Tang blamed Nexstar for these third-party characterizations, although Nexstar did not publish a single statement regarding the internal memorandum which even named Tang, let alone attributed any negative characteristics to him.

One year later, Tang filed this lawsuit against Nexstar alleging defamation, defamation per se, false-light invasion of privacy, and violations of the ERKA. But Tang has failed to present any evidence that Nexstar published any false statements about him or that Nexstar should somehow

be held accountable for statements published by third parties. The record is similarly bereft of any evidence supporting Tang's false-light and ERKA claims. It is notable that although a number of news outlets posted stories expressly mentioning Tang by name and referring to him as anti-gay or bigoted, Tang elected not to sue them or even demand retractions, suggesting that even those statements were not actually defamatory and confirming that Nexstar's statements fall far short of the standard required to establish defamation.

As there are no genuine issues of material fact for a factfinder to decide and Nexstar is entitled to judgment as a matter of law, Nexstar respectfully requests that the Court issue an award of summary judgment in Nexstar's favor on each of Tang's claims.

## II.    **STATEMENT OF UNDISPUTED FACTS**

### A.    **Tang's Employment with Nexstar and Nexstar's Standards Guide**

Tang began his employment with Nexstar in 2021. (Ex. 1, Tang Deposition Transcript ("Dep."), page 142, Lines 18-23 (hereinafter "Ex. 1,. __:__").[1] Nexstar owns television stations across the country and is the parent company of Grand Rapids-based TV news station WOOD-TV where Tang held the position of News Director. (Ex. 2, Brinks Dep. 177:25 – 178:6). As News Director, Tang's chain of command included reporters and anchors who reported to show producers, who in turn reported to executive producers, who in turn reported to Fox. (Ex. 3, Fox Dep. 41:1-16). Fox reported to Tang, who reported to General Manager Julie Brinks ("Brinks"). (*Id.* at 41:3-5; Ex. 1, 36:14-24).

Nexstar maintains a Standards Guide which outlines Nexstar's guidelines and policies regarding journalism standards. (Ex. 4, Standards Guide). One such standard states: "We do not

---

[1] All deposition citations shall hereinafter follow this same format, i.e., "(Ex. #, [last name] Dep. __:__)" for the first citation, followed by "(Ex. #, __:__)" for all subsequent citations.

act on behalf of special interests." (*Id.*, at p. 3). As the News Director for WOOD-TV, Tang was responsible for upholding and abiding by Nexstar's Standards Guide. (Ex. 5, Tully Dep. 31:12-18; Ex. 3). As the Assistant News Director, Fox was similarly responsible for sharing these journalism standards with newer employees and ensuring that such standards were followed. (Ex. 3, 276:12-24). Tang ultimately had to follow and defer to Nexstar's interpretation of its own Standards Guide. (Ex. 1, 35:20 – 36:6; 39:17 – 40:1). Fox similarly knew that she did not have the ultimate power to decide what Nexstar's values are. (Ex. 3, 167:6-7).

**B.      Fox and Tang Issue the Internal Memo and Lose the Trust of the Newsroom**

Tang became concerned with the number of companies, including Bud Light and Target, who were facing backlash after "taking a stand" on Pride Month. (Ex. 1, 173:9-13). Specifically, Tang was concerned that "the part of this community which is considered conservative" was already complaining that there was too much Pride coverage. (*Id.* at 176:3-7). In Tang's own words, "[i]f your core audience feels that you are not taking into consideration what their desires are, then you run a risk of alienating your audience. That was my concern." (*Id.* at 179:16-19). On June 13, 2023, to avoid alienating conservative viewers, Tang approached Fox and raised concerns about Nexstar's Pride coverage, telling Fox that he had gotten complaints from viewers about some of Nexstar's June 2023 Pride coverage. (*Id.*; Ex. 3, 231:1-19, 234:15-21). Though Fox did not know it at the time, several of these complaints had come from members of Tang's church. (Investigation Executive Summary, Ex. 6; Ex. 7, Williams Dep. 43:2-3). Tang asked Fox to draft an internal memorandum regarding Pride coverage (the "Internal Memo") and to bring the draft to him for review. (Ex. 3, 237:2-8). Fox sent the Internal Memo to the entire news staff at WOOD-TV at approximately 11:20 a.m. (*Id.* at 237:12-19; Ex. 8, Internal Memo). While Fox believed that the Internal Memo would be controversial and even suggested to Tang that they should not send it

out at all, Fox circulated the Internal Memo to the entire newsroom despite her reservations. (Ex. 3, 240:11-15; 241:2-20).

The Internal Memo stated that West Michigan "is a conservative area in many ways" and reflected on the need to "recognize that some stories related to LGBTQ issues are going to be controversial and polarizing in our community." *Id.* The Internal Memo admonished news staff that "we should not cover every Pride event that we learn about." *Id.* The Internal Memo ended with a requirement to: "get both sides of the issue," followed by an invitation to have a conversation with Fox or Tang regarding questions about "if and how we should cover a Pride related story." *Id.* Neither Fox nor Tang consulted or reviewed Nexstar's journalism standards contained in the Standards Guide – including the "we do not act on behalf of special interests" standard – prior to drafting the Internal Memo. (Ex. 3, 230:21-25; Ex. 1, 194:19-22).

The first person that Fox discussed the Internal Memo with was executive producer Luke Stier ("Stier") who Fox described as "very upset," saying he "immediately became very angry." (Ex. 3, 195:7-9). Shortly after this conversation, Stier called station manager Brinks to inform her that there was a memo that employees were upset about, which was how Brinks first became aware of the Internal Memo. (Ex. 2, 23:24 – 24:6). Stier then sent Brinks the Internal Memo. (*Id.* at 24:1-6). But Stier was not the only employee upset – one of the first people Tang discussed the Internal Memo with was Digital Director Charlsie Dewey ("Dewey"). (Ex. 9, Dewey Dep. 10:6-19; Ex. 1, 242:21-22). Dewey recalls reading the Internal Memo the day it was issued and thinking "this is so f**ked up." (Ex. 9, 33:18 – 34:10).

Shortly thereafter, Fox and Tang held their regular afternoon meeting with the news staff. (Ex. 3, 245:10-14). At this meeting "people were very upset and very angry." (*Id.* at 245:15-17). A variety of employees objected to the Internal Memo's directive to "get the other side of the

4

issue" on Pride events and were further upset because they thought Fox and Tang were insinuating that there should be less Pride coverage. (*Id.* at 245:17-24). Fox even recalled executive producer Stier yelling during the meeting. (*Id.* at 89:18-22). Neither Fox nor Tang apologized during this first meeting. (*Id.* at 247:14-18; Ex. 1, 198:3-10).

Fox and Tang held two additional meetings the next morning (on June 14, 2023) regarding the Internal Memo to allow them to meet with other news staff. (Ex. 3, 254:22 – 255:1). The employees were "still very upset" and "very hurt." (*Id.* at 255:5-10). During this meeting, Fox and Tang agreed that they should have included the executive producers in the discussion regarding Pride coverage. (Ex. 10, Phelps-Nickisch Dep. 56:1-18). Fox and Tang did not apologize for their reasons for sending the Internal Memo, and Tang specifically "stood behind the fact that we needed to be careful with our coverage to not alienate our viewers." (Ex. 3, 247:18 – 248:2; Ex. 1, 197:16-20). However, by this time, it had become clear that Fox and Tang had lost the trust of the newsroom they were supposed to be leading. (Ex. 7, 39:4-11; Ex. 9, 75:1-2; Ex. 5, 60:24 – 61:1; Ex. 11, Underwood Dep. 28:3-6).

### C.    Internal and External Responses to the Internal Memo

On Tuesday June 13, 2023, Stier informed the newsroom that he had contacted a competitor outside of the company and disclosed information about the Internal Memo that had been sent approximately four hours earlier. (Ex. 10, 37:8-12). As a result of Stier's unauthorized leak of the Internal Memo, outside news organizations began to publish articles and the public began to complain about the Internal Memo. (Ex. 3, 258:15-17). After the two staff meetings on Wednesday June 14, 2023, Brinks sent an email to the WOOD-TV news staff regarding the Internal Memo (the "June 14 Email"). (Ex. 12, June 14 Email; Ex. 2, 89:11-16). The June 14 Email gave an overview of Brinks' intended next steps as General Manager and encouraged employees to reach out to her and share any thoughts or concerns that they may have. (Ex. 12). The June 14

Email did not name Fox or Tang, nor did it link any negative characteristics to their names. (*Id.*; Ex. 3, 154:7-15; 155:13-16).

During this same time, Brinks was communicating with Vice President and Chief Communications Officer Gary Weitman ("Weitman") regarding how Nexstar should move forward and how to respond to the Internal Memo. (Ex. 2, 78:14 – 79:5). These discussions resulted in Weitman drafting an external reactive statement on behalf of Nexstar to be used in response to the several outside media inquiries which Weitman had already received ("Nexstar's First Statement"). (Ex. 13, Weitman Dep. 83:22 – 84:4, 85:23-2). This statement read:

> Diversity, equity, and inclusion are among Nexstar's core values. Our local TV stations are expected to cover and report the news of the day in an expansive and inclusive fashion, consistent with these values. We're looking into the situation at WOOD-TV, as the communication regarding the station's coverage of PRIDE month activities in the area is not consistent with Nexstar's values, the way we cover the news, or the respect we have for our viewers. We will take appropriate action as necessary to address this situation, and apologize for offending members of the LGBTQ community and WOOT-TV's viewers.

(Ex. 14, Nexstar's First Statement). On Thursday, June 15, 2023, Weitman sent Nexstar's First Statement to several news outlets, including CNN and Crain's Grand Rapids Business, in response to their requests for comment. (Ex. 13, 77:17-20, 94:1-7). Upon Stier's request, Weitman also sent Nexstar's First Statement to Stier who placed it on WOOD-TV's website. (*Id.* 105:4-18, 107:9-17). Also on Thursday, June 15, 2023, multiple newsroom employees posted about the Internal Memo on private social media accounts, but none identified Fox or Tang or otherwise attribute any anti-gay or negative characteristics to them. (Ex. 3, 147:17-21).

On Friday, June 16, 2023, Brinks sent two statements, drafted by Weitman, to the WOOD-TV department heads to inform them of the messaging that would be used at the local level both internally and externally. (Ex. 2, 123:6 – 124:2; Ex. 15, Department Head Email Chain, pp. 2-3). Though Tang noted that he had a "personal objection to the wording" based on his own

interpretation of Nexstar's values, he did not allege defamation. (Ex. 15, p. 1; Ex. 1, 259:6 – 260:7; Ex. 2, 130:3-14).

On Friday, June 16, 2023, Brinks sent an email to the WOOD-TV staff which contained the internal statement that Weitman had drafted for her (the "June 16 Email"). (Ex. 16, June 16 Email). The June 16 Email made clear that the Internal Memo did not reflect the station's values or the way the station covered the news. *Id.* The June 16 Email confirmed that (1) WOOD-TV would not be changing its coverage of Pride events and (2) members of Nexstar's senior HR team would be investigating what happened. *Id.* The June 16 Email did not reference Fox or Tang by name, nor did it attribute any negative characteristics to either of them. *Id.*

### D.    Nexstar Investigates the Internal Memo and Terminates Four Employees

Nexstar assigned Vice President of Human Resources and Chief Diversity Officer Courtney Williams to investigate the situation along with Senior Vice President and Regional Manager Underwood, both of whom flew to Grand Rapids within a week of Fox sending out the Internal Memo. (Ex. 17, Bush Dep. at 10:14 – 11:2). The individuals that Underwood and Williams met with during the investigation made it clear that Fox and Tang had lost the respect and trust of the newsroom. (Ex. 11, 28:3-6; Ex. 7, 39:6-11). Fox told Williams that Fox had been aware that the memo would be controversial and might bother some of the news staff, and Tang told Williams that members of Tang's church had an issue with the station's Pride coverage. (Ex. 6, p. 1; Ex. 7, 35:22 – 36:5, 43:2-4). Williams consulted with Nexstar's Senior Vice President, Local Content Development Susan Tully ("Tully"), who was responsible for overseeing Nexstar's Standards Team and training Nexstar's news directors on Nexstar's journalism standards. (Ex. 7, 42:13-19; Ex. 5, 8:20-23, 9:23 – 10:4).  Tully determined that the Internal Memo was wrong, inappropriate, should never have been sent, and did not uphold Nexstar's journalism standards because it was

advocating for changes in news coverage based on complaints from a special interest group, namely viewers opposed to Pride month stories. (Ex. 5, 65:16-23, 67:23, 70:11-13, 71:22 – 72:2).

Williams and Underwood prepared an executive summary recommending that Fox and Tang both be terminated for (1) losing the trust of the newsroom and (2) violating Nexstar's standards of journalism. (Ex. 6, p. 1; Ex. 7, 38:22 – 39:11). Williams recommended that Stier and another executive producer, Madeline Odle ("Odle"), also be terminated based on the investigation's findings that they had released confidential information to external third parties. (Ex. 7, 25:1-11, 26:7-10). Bush, Underwood, and President of Nexstar's Broadcasting division Andy Alford ("Alford") made the decision to terminate the employment of Fox, Tang, Stier, and Odle. (Ex. 17, 21:18 – 23:5). Fox and Tang were notified of their respective terminations on June 29, 2023. (Ex. 3, 266:11-14; Ex. 1, 16:22-25).

On June 29, 2023, CNN reporter Liam Reilly ("Reilly") emailed Weitman to inquire whether Stier, Odle, DeSelms, and Tang had been fired, the reasons for their terminations, and the status of Nexstar's investigation. (Ex. 18, Reilly Email Chain, p. 3; Ex. 19, Reilly Dep. 13:22 – 14:8; Weitman Dep. 139:8-21). Reilly emailed Weitman because he had already seen one or more stories regarding the terminations. (Ex. 18, pp. 2-3). In response, Weitman provided an on the record statement ("Nexstar's Second Statement") which read:

> We can confirm that WOOD-TV made changes to its newsroom leadership team to ensure its ability to continue providing outstanding local news coverage and service to the Grand Rapids community and surrounding area. As these are internal personnel decisions involving matters of personal privacy, we will decline further comment.

(Ex. 18, p. 2; Ex. 13, 139:22 – 140:10). Reilly asked Weitman whether Fox and Tang were still employed by WOOD-TV or Nexstar. (*Id.*; Ex. 19, 15:11 – 16:1). Weitman confirmed only that Tang and Fox were no longer with the station, but did not inform Reilly whether that was due to a

termination, resignation, or transfer to protect the privacy of Fox and Tang. (Ex. 18; Ex. 13, 142:3-5, 144:22 – 145:4, 145:17-21).

On June 30, 2023, Weitman received a similar media inquiry from Andy Balaskovitz ("Balaskovitz") at Crain's Grand Rapids Business asking Weitman to (1) comment on the article published by The Desk which had reported that Tang, Odle, Stier, and Fox had been fired and (2) confirm those firings. (Ex. 20, Balaskovitz Email Chain; Ex. 13, 151:15 – 152:2). Weitman provided Balaskovitz with Nexstar's Second Statement, then informed Balaskovitz off the record that with regard to the undefined personnel changes in Nexstar's Second Statement, the four employees Balaskovitz had referenced from The Desk's article were the individuals involved in WOOD-TV's leadership changes. (Ex. 20; Ex. 13, 153:10-18, 156:16-20). Weitman intentionally did not confirm whether these individuals had been fired or what specific personnel decisions had been made. (Ex. 13, 155:18-22, 156:16 – 158:5).

### E. Tang Files Suit Following Third-Party Publications Regarding the Internal Memo

A number of local and national third-party media agencies published stories calleing Fox and Tang anti-gay, bigoted, and/or attributed other negative characteristics to them. None of the statements published by Nexstar mention Fox's or Tang's name, let alone call them bigoted/anti-gay or attribute any other negative characteristics to them. (Ex. 14; Ex. 18, p. 2; Ex. 20, p. 1). Tang did not sue any third-party agencies referring to him as bigoted or anti-gay.  This places Tang in the awkward position of having to explain how Nexstar's statements that do not attribute negative characterizations to him are defamatory and require redress, while those statements from third parties that actually do so are not defamatory and do not require redress.

Based on the above undisputed facts and as explained more fully below, the Court should grant summary judgment to Defendant on Plaintiff's defamation, defamation per se, false light and Employee Right to Know Act claims as a matter of law.

## III.    LAW AND ARGUMENT

### A.    Nexstar Did Not Defame Tang as a Matter of Law

Under Michigan law, a defamation claim requires Tang to show: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication." *Edwards v. Detroit News, Inc*., 322 Mich. App. 1, 910 N.W.2d 394, 400 (Mich. Ct. App. 2017) (citing *Lakin v. Rund*, 318 Mich. App. 127; 896 N.W.2d 76, 79 (Mich. Ct. App. 2016)). In this matter, Tang has failed to establish (1) that any statement published by Defendant even named/identified Plaintiff, let alone that any such statement was false and defamatory; (2) that Defendant was negligent in publishing neutral, factually correct statements that did not name Plaintiff or describe the events in sufficient detail that a reasonable reader would understand the statement to refer only to Plaintiff; or (3) that Defendant should be held at fault for statements published by unaffiliated third party individuals and news outlets that are not parties to this action. Thus, as set forth in detail below, Plaintiff has failed to establish a prima facie case for defamation and an entry of summary judgment for Defendant on Plaintiff's claims is appropriate.

Regarding his defamation claim, Plaintiff identified the following statements which he contends are false and defamatory statements published by Nexstar: (a) numerous statements by third-party "media outlets" which reported that the Internal Memo ordered staff reporters not to cover Pride related events; (b) Nexstar's First Statement issued by Weitman on June 15, 2023 and posted to WOOD-TV's website by Stier (Ex. 14); (c) An article published by CNN on June 30,

10

2023 which claimed Tang had been fired "following the circulation of an internal memo calling for scaled-back coverage of Pride Month events and directing the station's journalists to 'get both sides' on LGBTQ issues.." (Ex. 21, June 30, 2023 CNN Article); (d) part of Nexstar's Second Statement issued by Weitman on June 29, 2023 quoted in the June 30, 2023 CNN article (*Id.* at p. 2); and (e) numerous unidentified "similar statements" published by third-party news agencies and Tang's subordinates, "47 of which are attached as Exhibit 5 to Plaintiff's complaint." (*See* Ex. 22, Plaintiff's 11/15/24 Interrogatory Response to Interrogatory No. 7). Plaintiff confirmed in his deposition that these are the only statements composing his defamation claims. (Ex. 1, 234:6-13).

### 1. Plaintiff has failed present any statements by Nexstar that were false and defamatory about him

Only two of the statements identified by Plaintiff were actually made by Nexstar managers: Nexstar's First Statement and Nexstar's Second Statement. As explained herein, neither of these statements defamed Plaintiff.

Tang cannot identify any false statements in Nexstar's First Statement (*Id.* at 128:3 – 130:8) or the portion of Nexstar's Second Statement identified in his interrogatory responses (*Id.* at 132:15 – 134:20). Rather, regarding Nexstar's First Statement, Tang testified that he merely disputes the sentence in Nexstar's First Statement which reads "the communication regarding the station's coverage of Pride Month activities in the area is not consistent with Nexstar's values, the way we cover the news, or the respect we have for our viewers." (*Id.* at 128:11-15). In Tang's own words "So the Nexstar values as outlined in the news handbook says that issues will be covered with all points of view. So to say that a point of view is not relevant to the story I think makes it a false statement." (*Id.* at 128:24 – 129:2). To be clear, Tang did not testify as to any facts that could actually prove this statement to be false, he testified that based on his interpretation of Nexstar's journalism standards, *he* thinks it is a false statement. *Id.* But despite what Tang may think, his

own interpretation of Nexstar's journalism standards does not make Nexstar's statement false. Indeed, Tang admitted that he did not have the authority to tell Nexstar how to interpret its own policies. (*Id.* at 35:11 – 36:6). Fox further testified that Nexstar's interpretation of its own policies had to be followed over his own interpretation, which makes sense because these are *Nexstar's* policies, not Tang's. (*Id.* at 39:17 – 40:1).

As for Nexstar's Second Statement, Tang testified that everything in that statement was true except for his belief that the reason for the "personnel changes" referenced was not to ensure the station's ability to continue providing outstanding news coverage but instead believed that "the impetus to fire us was made to placate the newsroom." (*Id.* at 133:13-21). But even Tang admits that this belief is mere speculation because (1) as an at will employee, he could have been terminated for any reason and (2) he has no personal knowledge of what led to the decision to fire him. (*Id.* at 126:6-18, 133:22 – 134:20). Tang further concedes that Nexstar's First Statement and Nexstar's Second Statement do not name him or attribute any negative characteristics to him whatsoever. (*Id.* at 130:9 – 131:5, 235:3-6).

In reality, Tang is unable to identify a single fact about himself contained in either of these statements which is defamatory or false. Indeed, these statements do not state any facts about Tang at all but instead reflect Nexstar's opinion and interpretation that the Internal Memo does not align with Nexstar's own values. As such, these statements are not "provable as false," defeating Plaintiff's defamation claim from the outset. *See Andrews v. Fixel Law Offices, PLLC,* 2015 Mich. App. LEXIS 757, at *10 (2015) ("To be actionable, a statement must be provable as false and state actual facts about the plaintiff.") (citing *Kevorkian v. American Medical Ass'n,* 237 Mich. App. 1, 5-6 (1999); *Ireland v. Edwards,* 230 Mich. App. 607, 616-17 (1998)).

Further, even if the issue of whether the Internal Memo aligns with Nexstar's values could be proven true or false – which is not the case because Nexstar is the only entity that can decide what does or does not align with its own values – the record evidence in this matter clearly demonstrates that the Internal Memo <u>does not</u> coincide with Nexstar's values. Nexstar's Standards Guide outlines Nexstar's journalism principles, values, and standards for its employees. (Ex. 4; Ex. 5, 77:16-21). One of the key tenants of Nexstar's Standards Guide is independence, and with regard to independence the Standards Guide specifically states: "We do not act on behalf of special interests." (Ex. 4, p. 3). Tang was well familiar with Nexstar's journalism standards, as his job duties required him to train other employees on them each quarter. (Ex. 1, 255:14-20).

While Tang may claim he disagrees that the Internal Memo does not align with Nexstar's values, the text and the purpose behind the Internal Memo do not support his opinion. Specifically, the Internal Memo states, in pertinent part:

> we have also started to hear pushback from viewers who are not happy to see those Pride related stories. We know that West Michigan is a conservative area in many ways. We need to recognize that some stories related to LGBTQ issues are going to be controversial and polarizing in our community. While you personally may not agree with a certain position, people are entitled to their opinions and they are our viewers . . . We should not cover every pride event that we learn about . . . If we are covering pride events we need to consider how to make the story balanced and get both sides of the issue.

(Ex. 8). Though the Internal Memo is clear on its face that it is advocating for less pride coverage based on the special interest group of conservative viewers, Tang also confirmed several times in his deposition that the purpose of the Internal Memo was to advocate on behalf of conservative viewers to avoid alienating them due to Pride coverage:

- "the part of this community which is considered conservative, they were already expressing the fact that there was too much of that coverage." (Ex. 1, 176:4-7).

- "If your core audience feels that you are not taking into consideration what their desires are, then you run a risk of alienating your audience. That was my concern." (*Id.* at 179:16-19).

- "if we continued to do stories simply about [Pride] festivals, then we risk alienating the audience, which was the core problem for Target and Bud Light. They were alienating their core audience. That's what I was trying to avoid." (*Id.* at 192:13-17).

In addition to confirming this purpose behind the Internal Memo, Tang further agreed that the Internal Memo did in fact require or call for a change in Pride coverage. (*Id.* at 212:6-8).

Put simply, Tang directed Fox to send the Internal Memo to news staff with the intent of lessening the station's amount of Pride coverage in direct response to negative feedback received from conservative viewers and for the specific purpose of trying to avoid alienating those conservative viewers. As the head of Nexstar's Standards Team Susan Tully testified, that intent is the reason that the Internal Memo does not coincide with Nexstar's values or journalism standards: "The concerning part about the memo where I think it violates standards is . . . the fact that this memo was sent because of a special interest, a special interest group," and "the memo came out of concerns from a special interest group" and "we don't represent special interest." (Ex. 5, 49:23 – 50:11). Tully further testified: "it was advocating on behalf of a special interest . . . We get complaints daily from people who don't like, viewers who don't necessarily agree with or like our coverage. It does not mean we advocate. We listen to them respectfully, but we don't advocate on their behalf because they're a special interest group." (*Id.* at 69:7-21). When asked to identify the special interest group, Tully confirmed "the special interest is the people who are opposed to seeing or hearing about the stories about Pride Month." (*Id.* at 71:25 – 72:2).

Though Tully leads Nexstar's Standards Team and was the primary individual consulted on whether the Internal Memo violated Nexstar's standards/values, she was not the only Nexstar executive to testify that the Internal Memo did not align with Nexstar's standards/values: (1) Gary

14

Weitman testified: "And the memo was not consistent with those things, because the memo appears to tell people in the newsroom to tailor their coverage, reduce their coverage, or restrict their coverage of Pride Month activities." (Ex. 13, 70:4-9); (2) Julie Brinks testified: "we get a lot of concerns from viewers expressed about a lot of stories. That's not how we determine whether or not we continue doing stories. And so if there was determinations to pull back coverage based on viewer feedback, that would potentially not align with our values of full coverage." (Ex. 2, 119:11-17); (3) Theresa Underwood testified: "That's basically chilling coverage of Pride events for the remainder of the month. It's not consistent with company policy. [Fox] also referenced that the fact that this was being done in response to viewer feedback…we do not slant any of our coverage for any particular group or viewer." (Ex. 11, 29:2-10); (4) Terri Bush testified: "[the Internal Memo] said in essence we're getting feedback that we're having too many gay stories. That part of it could be seen as discriminatory. But the issues I drove down to eventually was the journalism standards and how we cover the news." (Ex. 17, 58:5-10). As succinctly stated by Tully based on Nexstar's journalism standards: "to put out a blanket memo because a group complained is highly inappropriate." (Ex. 5, 70:17-19).

As such, while the question of whether the Internal Memo aligns with Nexstar's values and standards is not provable as true or false, even if it were, the evidence in the record clearly shows that the Internal Memo does not coincide with Nexstar's values and standards. Accordingly, Tang cannot establish that the sentences in Nexstar's First Statement or Nexstar's Second Statement which state that the Internal Memo does not coincide with Nexstar's values are false statements. His defamation claim therefore fails as a matter of law with regard to both statements. *See, e.g., Williams v. Fannie* Mae, 2015 Mich. App. LEXIS 1405, at *18 (Mich. Ct. App. July 16, 2015) (quoting *Collins v. Detroit Free Press, Inc.*, 245 Mich. App. 27; 627 N.W.2d 5, 9 (Mich. Ct. App.

2001) ("substantial truth is an absolute defense to a defamation claim"); *Mitan v. Campbell*, 474 Mich. 21, 24; 706 NW2d 420 (2005) (holding that to be actionable, a statement must be false and defamatory); *Ledl v. Quik Pik Food Stores, Inc.*, 133 Mich. App. 583; 349 N.W.2d 529 (1984) (holding that prima facie defamation claims require a plaintiff to prove the falsity of the alleged defamatory statements); *Ireland,* 230 Mich. App. at 616-617 (finding that statements of opinion are protected where the statement cannot be "provable as false" and is thus necessarily subjective opinion).

### 2.  All other allegedly defamatory statements identified by Plaintiff were made by third parties, not by Nexstar

Putting aside the two statements made by Nexstar described above, the only other defamatory statements identified by Plaintiff are:

- Numerous statements by third-party "media outlets" which reported that the Internal Memo ordered staff reporters not to cover Pride related events

- An article published by CNN on June 30, 2023 which claimed Tang had been fired "following the circulation of an internal memo calling for scaled-back coverage of Pride Month events and directing the station's journalists to 'get both sides' on LGBTQ issues." (Ex. 21)

- Numerous unidentified "similar statements" published by third-party news agencies and Tang's subordinates, "47 of which are attached as Exhibit 5 to Plaintiff's complaint."

(Ex. 22). Importantly, none of these statements were published by Nexstar, but were instead published by third-party news agencies with some of them including social media posts made by Tang's subordinate employees. This fact alone defeats Plaintiff's defamation claim as to Nexstar with regard to these third-party statements.

Further, aside from the one CNN article Plaintiff provided a quote from, Plaintiff has altogether failed to identify with any specificity whatsoever which statements in the third-party news articles he claims are defamatory. Rather, Plaintiff's interrogatory response simply states that

16

these third-party articles (1) falsely reported that Plaintiff directed Fox to prepare an Internal Memo which ordered staff not to cover Pride-related events and (2) quoted Nexstar's First Statement and/or Nexstar's Second Statement "in articles and posts which also identified the Plaintiff," which Tang claims "were published over and over again in numerous internet postings, 47 of which are attached as Exhibit 5 to Plaintiff's complaint." *Id.* Notably, Exhibit 5 to Plaintiff's Complaint is a nearly 30-page listing of 47 various news articles with weblinks and bullet point summaries of those stories without any indication whatsoever as to what statements within each of those 47 different stories are false statements published by Nexstar. (*See* ECF No. 1, PageID #: 45-71). Tang has not otherwise identified with any specificity which statements are supposedly defamatory or how those statements are false. This is fatal to his defamation claim as to these statements. *See Ghanam v. Does,* 303 Mich. App. 522, 543 (2014) ("a plaintiff claiming defamation must plead a defamation claim with specificity by identifying the exact language that the plaintiff alleges to be defamatory"); *Thomas M. Cooley Law Sch. v. Doe,* 300 Mich. App. 245, 266 (2013) ("under Michigan law, the plaintiff must allege the exact defamatory statements."). The Michigan Court of Appeals has further held that without this required specificity, the court "would be left searching the cited webpages with the hope of finding comments that do or do not support his claim. This is his, not our, burden, and we decline to do so for him." *Sarkar v. Doe,* 318 Mich. App. 156, 184-85 (2016). The Court should similarly decline to assume Tang's burden for him here.

As for any employee statements contained in these third-party news reports which Tang claims are defamatory – even assuming that any of them contain false statements as opposed to opinions (which Nexstar denies) – all such statements were made in those individual's personal capacity, outside the scope of their employment with Nexstar. The respondeat superior doctrine in Michigan "does not allow for vicarious liability if employees commit torts outside the scope of

their employment or without the employer's instructions or authority." *See Cambridge Dental, LLC v. JPMorgan Chase Bank N.A.,* 2020 U.S. Dist. LEXIS 226908, at *5 (E.D. Mich. Dec. 3, 2020) (citing *Hamed v. Wayne Cty.,* 490 Mich. 1 (2011)). Indeed, an employer cannot be liable even when the employee "purported to act or speak on behalf of the principal and there was reliance upon apparent authority" or where an employee "aided in accomplishing the tort by the existence of the agency relationship." *Zsigo v. Hurley Med. Ctr.,* 475 Mich. 215, 221, 231 (2006); *see also Henderson v. Walled Lake Consol. Schools,* 469 F.3d 479, 494 (6th Cir. 2006) ("his employer can be liable in *respondeat superior* only if his slanderous statement was made while he was engaged in his employer's work and was acting within the scope of his authority.").

Here, none of the statements published by Tang's subordinates on social media were published while those employees were engaged in Nexstar's work or were acting within the scope of their employment or authority. In fact, Nexstar's policies specifically prohibit employees from speaking on behalf of the company unless authorized by Weitman. (Ex. 23; Ex. 13, 10:12-24; Ex. 17, 34:10-14). Accordingly, with respect to any employee social media posts and unspecified defamatory statements Tang claims are contained in third-party publications, his defamation claim fails as a matter of law.

### 3.  Plaintiff cannot establish defamation by implication

"A cause of action for defamation by implication exists in Michigan, but only if the plaintiff proves that the defamatory *implications* are materially false." *Reighard v. ESPN, Inc.,* 341 Mich. App. 526, 540 (2022) (citing *Hawkins v. Mercy Health Servs., Inc.,* 230 Mich. App. 315, 330 (1998)). "Liability for defamation by implication may be imposed based not on what is affirmatively stated, but on what is implied when a defendant "juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting

facts such that he may be held responsible for the defamatory implication." *Id.* (citing Prosser & Keeton, Torts (5th ed, 1988 Supp), § 116, p 117) (emphasis added). Tang cannot establish defamation by implication in this matter because it was not Nexstar that juxtaposed a series of facts to create a defamatory implication, but rather the third-party media sources that published articles in the days and weeks following the Internal Memo.

It is expected that Plaintiff will attempt to misrepresent the findings in *Hawkins* to support his claims. But *Hawkins* reinforced critical shortcomings in Plaintiff's claims. The first critical difference in *Hawkins* is that the juxtaposed defamatory publications were released directly by the defendant hospital, not a myriad of third-party individuals and organizations as is the case here. Further, the statements by the defendant in *Hawkins* were much more direct in implicating the plaintiff in that case. The statements in *Hawkins* specifically said: "While the patient was being cared for by two registered nurses and a physician, there appears to have been an inappropriate dosage of medication administered" followed by a statement that "in accordance to [sic] our employee disciplinary policies and procedures, one employee is no longer with the hospital." *Hawkins,* 230 Mich. App. at 320-21. That level of implication is not what happened here.

Moreover, and most importantly, the plaintiff in *Hawkins* was able to establish that the defamatory implication from the defendant's statements in that case – i.e., that the plaintiff had been terminated because she was responsible for killing a patient via overdose – was materially false. Indeed, the plaintiff in *Hawkins* was terminated for lying, not for her involvement in the patient's overdose. *Hawkins,* 230 Mich. App. at 319. In the instant matter, there is no such materially false defamatory implication that can be gleaned from Nexstar's statements. When read together, Nexstar's statements only mention "changes to newsroom leadership" due to an internal communication that was "not consistent with Nexstar's values, the way we cover the news, or the

19

respect we have for our viewers." (Ex. 14; Ex. 18, p. 2; Ex. 20, p. 1). At best, Tang could argue

that these statements imply that he was terminated because the Internal Memo he directed Fox to

write was not consistent with Nexstar's values, journalism principles, and how it covers the news;

but that is not a materially false implication. Indeed, that is one of the exact reasons that he was

terminated. (Ex. 17, 24:21 – 25:12).

In sum, Tang cannot establish defamation by implication because there is no materially

false implication about Tang that can be drawn from Nexstar's statements. *See Hieber v. Oakland

Cnty.,* 136 F.4th 308, 326 (6th Cir. 2025) ("To succeed, the plaintiff must prove that the defamatory

implications are materially false."). Tang's unsupported attempt to expand the limits of his

defamation by implication claims to find liability based on the juxtaposition of Defendant's

statements with the statements of unrelated third parties should be disregarded as such is clearly

outside the bounds of Michigan law. *Reighard,* 341 Mich. App. at 540 ("Liability for defamation

by implication may be imposed based . . . on what is implied when a defendant 'juxtaposes a series

of facts…'") (emphasis added).

### B.    Plaintiff's Defamation Per Se Claim is Not Actionable

Plaintiff's defamation per se claim fails as a matter of law. Though at common law

defamation per se *historically* concerned "issues of chastity, commissions of a crime, loathsome

disease, or disparagement of one's profession or business" *(see Nehls v. Hillsdale Coll.*, 65 F.

Appx 984, 990-91 (6th Cir. 2003) (emphasis added)), that is no longer true. When Michigan

codified defamation, it specifically eliminated the disparagement of a person's profession or

business as grounds for defamation *per se* and retained the rule relating to words imputing a lack

of chastity or allegations imputing the commission of a crime. *See* Mich. Comp. Laws

600.2911(1); *see also* MCL 600.2911(2)(a) (stating "plaintiff is entitled to recover only for the

actual damages which…she has suffered in respect to…her property, business, trade, profession,

occupation, or feelings.")(emphasis added); *George v. Senate Democratic Fund*, No. 253202, 2005 WL 102717 (Mich. Ct. App. May 3, 2005) (recognizing that statements concerning one's business or profession are not actionable as defamation per se); *Lakin v. Rund¸* 318 896 N.W.2d 76, 81 (Mich. App. 2016), *appeal denied*, 894 N.W.2d 53 (Mich. 2017) (finding that the prevailing rule in Michigan courts is that words constitute defamation per se only "if the invoked crime involves moral turpitude or would subject the person to an infamous punishment."); *see also Daneshvar v. Kipke*, 266 F. Supp. 3d 1031, 1055 (E.D. Mich. 2017) (finding same).  Here, Plaintiff's claims are based entirely on (false) allegations that Defendant disparaged his profession or business. Plaintiff has not presented any evidence that the alleged defamatory statements concerned a lack of chastity or allegations imputing the commission of a crime, which are the only statements on which defamation per se may be based.  The clear Michigan precedent therefore forecloses any claims for defamation per se and defamation per se by implication, and Defendant is accordingly entitled to judgment as a matter of law on this claim. Though Plaintiff also cannot establish the third and fourth elements of his prima facie defamation claims (fault and damages), Defendant will not expand on such elements given Plaintiff's inability to establish the first and second elements of his prima facie case of defamation.

### C.    Nexstar Is Not Liable for False-Light Invasion of Privacy

"In order to maintain an action for false-light invasion of privacy, a plaintiff must show that the defendant broadcast to the public in general, or to a large number of people, information that was unreasonable and highly objectionable by attributing to the plaintiff characteristics, conduct, or beliefs that were false and placed the plaintiff in a false position." *Puetz v. Spectrum Health Hosps.,* 324 Mich. App. 51, 69 (2018) (quoting *Duran v. Detroit News, Inc.* 200 Mich. App. 622, 631-32 (1993)). Further, "malice is an element of false-light invasion of privacy," meaning that Tang must establish that Nexstar disseminated information with actual knowledge or

21

reckless disregard of the truth or falsity of the publicized matter." *Found. For Behavioral Res. v. W.E. Upjohn Unemployment Tr. Corp.,* 332 Mich. App. 406, 413 (2020).

Plaintiff's false-light invasion of privacy claim fails as a matter of law because as described at length above, plaintiff cannot identify any information published by Nexstar about him which is false. *See Hawthorne-Burdine v. Freedman,* 2018 Mich. App. LEXIS 1684, at *10 (2018) ("The 'gravamen' of a false-light invasion of privacy claim is that the information broadcast by the defendant and attributed to the plaintiff was *false*.). Moreover, there is absolutely no evidence in the record that Nexstar acted with malice when making any of the statements at issue in this lawsuit. Indeed, the opposite is true, as Weitman specifically testified that "we went to great lengths to protect the privacy of, as we always do, the employees who may have been directly involved in this situation. So they were not identified in the statement, and that was by design." (Ex. 13, 88:5-9).

Weitman confirmed his commitment to maintaining Tang's privacy a multitude of times throughout his deposition: "We did not identify people, and that was by design in order to protect their privacy while the investigation moved forward." (*Id.* at 121:24 – 122:1); "We honestly don't identify people like this because of privacy concerns." (*Id.* at 141:23-24); "What I would say is our objective is to make sure that we guard the privacy of those people involved in this situation." (*Id.* at 144:24 – 145:1); "In fact, we went out of our way here to say these are internal personnel decision[s] involving matters of personal privacy, and we decline further comment." (*Id.* 147:14-17); "So you can slice the deck however you want, but my objective in doing this is to protect the privacy of the individuals involved here." (*Id.* 147:19-21).

As there is no evidence that Nexstar broadcasted any false statements about Tang which cast him in a false-light and a plethora of evidence which shows that Nexstar's statements were

made without malice, Nexstar is entitled to judgment as a matter of law on Tang's claim for false-light invasion of privacy.

### D.    Nexstar Did Not Violate the Bullard-Plawecki Employee Right to Know Act

Plaintiff's Complaint alleges that Nexstar violated the ERKA by (1) notifying news media outlets of disciplinary action taken against Plaintiff without providing Plaintiff with written notice (MCL § 423.506) and (2) knowingly placing false information in Plaintiff's personnel file. (MCL § 423.505). (Complaint, ECF No. 1, PageID #: 28-29, ¶ 85). There is no record evidence to support either of Plaintiff's claims under the ERKA.

First, MCL § 423.506(1) merely states that an employer shall not "divulge a disciplinary report, letter of reprimand, or other disciplinary action to a third party" without written notice to the employee. Nexstar did not divulge any such information to a third party. While Plaintiff's Complaint alleges that Weitman violated the ERKA by informing two news outlets that Tang had been terminated, the evidence in this matter defeats such allegations. Though Weitman did engage in email correspondence with individuals (Reilly and Balaskovitz) from two media outlets shortly after Tang's termination, Weitman stated only that Tang was no longer with the station and intentionally did not divulge any information as to whether that was due to a termination, resignation, or transfer so as to protect Tang's privacy. (Ex. 18; Ex. 13,. 142:3-5, 144:22 – 145:4, 145:17-21; Ex. 20; Ex. 13, 153:10-18, 155:18-22, 156:16 – 158:5). This is insufficient to constitute a violation of the ERKA because Weitman did not divulge any disciplinary action with regard to Tang. *See, e.g., Scuderi v. Monumental Life Ins. Co.,* 344 F. Supp. 2d 584, 605 (E.D. Mich. Nov. 9, 2004) (finding defendant had not "divulged a disciplinary report, letter ore reprimand or other disciplinary action" despite specifically confirming that plaintiff's record was not spotless). Weitman's and Nexstar's statements do not identify Tang at all, let alone specify that any disciplinary action was taken against him, thus there can be no liability under the ERKA. *Id.*

Further, to trigger the notice requirement under the ERKA, an employer "must disclose or reveal something private, secret, or previously unknown." *McMannon v. Redford Charter Twp.,* 273 Mich. App. 131, 136 (2006). As such, even if Weitman had informed either of the two media outlets that Tang had been terminated (he did not), this still would not have constituted a violation of the ERKA because both media outlets had already been informed of the termination through twitter and an article published by The Desk. (Ex. 24, The Desk Article). Indeed, in their emails to Weitman asking about Tang's termination, both Reilly and Balaskovitz specifically referenced twitter and the article from The Desk which had already reported the terminations. (Ex. 18; Ex. 20). As Tang's termination was "already a matter of public record," Weitman would not have been the one to "divulge" that disciplinary action even if he had said that Tang had been terminated, further obviating any liability under the ERKA. *McMannon,* 273 Mich. App. at 136-37. Nexstar is thus entitled to judgment as a matter of law on Tang's first alleged violation of the ERKA.

Tang's second alleged violation of the ERKA is similarly devoid of merit and unsupported by record evidence. In his Complaint, Tang alleges that Nexstar violated the ERKA by including a "rationale for termination" in Plaintiff's personnel file which is based on the "false" premise that the Internal Memo violates Nexstar's journalism standards." (Complaint, ECF No. 1, PageID #: 30, ¶ 91). The pertinent section of the ERKA states in full:

> If there is a disagreement with information contained in a personnel record, removal or correction of that information may be mutually agreed upon by the employer and the employee. If an agreement is not reached, the employee may submit a written statement explaining the employee's position. The statement shall not exceed 5 sheets of 8-1/2-inch by 11-inch paper and shall be included when the information is divulged to a third party and as long as the original information is a part of the file. If either the employer or employee knowingly places in the personnel record information which is false, then the employer or employee, whichever is appropriate, shall have remedy through legal action to have that information expunged.

MCL § 423.505. But Tang does not allege in his Complaint that he ever (1) submitted a written statement explaining his position on a disagreement with information contained in his personnel file or (2) requested that Nexstar expunge any personnel records from his employee file, nor does he have any evidence that he even attempted to do either of these things. Tang also cannot establish that the rationale for his termination is false, as Tang himself testified that he has no personal knowledge and can only speculate regarding the rationale for his termination. (Ex. 1, 133:17 – 134:20). Tang's inability to show that false information was knowingly placed in his personnel file entitles Nexstar to judgment as a matter of law on Tang's second alleged violation of the ERKA. *See Kendall v. Integrated Interiors,* 2009 Mich. App. LEXIS 2151, at \*22 (2009) ("Plaintiff's evidence does not show that false information was knowingly placed in his file. Thus, plaintiff is not entitled to the remedy of expungement."); *Furby v. White,* 7 Fed. Appx. 306, 317 (6th Cir. 2001) (affirming summary judgment in favor of defendant where plaintiff "failed to demonstrate that the adverse information contained within his personnel record was false.").

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Nexstar respectfully requests that the Court grant its Motion for Summary Judgment in its entirety, dismiss all of Plaintiff's claims, and issue any other relief which the Court may deem just and proper.

Respectfully submitted,

 */s/ Richard W. Warren*
Richard W. Warren (P63123)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, PLLC
*Attorneys for Defendant*
34977 Woodward Avenue, Suite 300
Birmingham, MI 48009
TEL: (248) 631-3679
FAX: (248) 593-2603
Dated: August 22, 2025        richard.warren@ogletree.com

25

## **CERTIFICATE OF COMPLIANCE**

I certify that the text of this *Brief in Support of Defendant Nexstar Media Inc.'s Motion to For Summary Judgment*, as counted by Microsoft Word 2016, consists of 8,335 words including heading, footnotes, citations, and quotations (but excluding the case caption, cover page, table of contents, table of authorities, the signature block, this certificate of compliance, certificate of service, and exhibits) and complies with the requirements of Local Civil Rule 7.2(b)(i) and (ii) of the United States District Court for the Western District of Michigan.

As permitted by Local Civil Rule 7.2(b)(ii), the undersigned has relied upon the word count feature of this word processing system in preparing this Certificate of Compliance.

Respectfully submitted,

 */s/ Richard W. Warren*
Richard W. Warren (P63123)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, PLLC
*Attorneys for Defendant*
34977 Woodward Avenue, Suite 300
Birmingham, MI 48009
TEL: (248) 631-3679
FAX: (248) 593-2603
Dated: August 22, 2025        richard.warren@ogletree.com

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 22, 2025, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record.

*/s/ Richard W. Warren*
Richard W. Warren (P63123)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, PLLC
*Attorneys for Defendant*
34977 Woodward Avenue, Suite 300
Birmingham, MI 48009
TEL: (248) 631-3679
FAX: (248) 593-2603
richard.warren@ogletree.com

27

92061766.v3-OGLETREE