# EXHIBIT 9

```
                                                          Page 1
 1              UNITED STATES DISTRICT COURT
 2              WESTERN DISTRICT OF MICHIGAN
 3                   SOUTHERN DIVISION
 4   _____
 5   AMY FOX,
 6            Plaintiff,
 7       v.                                     Case No.
 8   NEXSTAR MEDIA GROUP, INC.,                  2024-CV-0614
 9            Defendant.
10   _____
11                    DEPOSITION OF
12                   CHARLSIE DEWEY
13   DATE:         Tuesday, April 8, 2025
14   TIME:         11:54 a.m.
15   LOCATION:     Law Offices of David Carrier
16                 4965 East Beltline Avenue Northeast
17                 Grand Rapids, MI 49525
18   REPORTED BY:  Brad Hall
19   JOB NO.:      7284410
20
21
22
23
24
25
```

Page 2

1    A P P E A R A N C E S
2  ON BEHALF OF PLAINTIFF AMY FOX:
3      NANCY TEMPLE, ESQUIRE
4      ELLIE BUCHANAN, ESQUIRE
5      Katten & Temple LLP
6      209 South LaSalle Street
7      Chicago, IL 60604
8      ntemple@kattentemple.com
9      ebuchanan@kattentemple.com
10     (312)663-0800
11
12 ON BEHALF OF DEFENDANT NEXSTAR MEDIA GROUP, INC. AND
13 CHARLSIE DEWEY:
14     RICHARD W. WARREN, ESQUIRE
15     Ogletree, Deakins, Nash, Smoak & Stewart, PLLC
16     34977 Woodward Avenue, Suite 300
17     Birmingham, MI 48009
18     richard.warren@ogletree.com
19     (248)593-6400

Page 3

1            I N D E X
2  EXAMINATION:                          PAGE
3     By Ms. Buchanan           5
4     By Mr. Warren             79
5
6            E X H I B I T S
7  NO.      DESCRIPTION                  PAGE
8  Exhibit 43    Forwarded Email of June
9             Pride Month Memo        38
10 Exhibit 44    June 13, 2023 Email Exchange
11            Between Charlsie Dewey and
12            Stanton Tang            42
13 Exhibit 45    Text Exchange With Tom Hillen    52
14 Exhibit 46    Timeline By Julie Brinks    55
15 Exhibit 47    Text Exchange with Rachel    78

Page 4

1            P R O C E E D I N G S
2        THE REPORTER: Good morning. My name
3  is Brad Hall; I am the reporter assigned by Veritext
4  to take the record of this proceeding. We will now be
5  on the record at 11:54 a.m.
6        This is the deposition of Charlsie
7  Dewey taken in the matter of Amy Fox and Stanton Tang
8  vs. Nexstar Media Group, Inc. on Tuesday, April 8,
9  2025, at 4965 East Beltline Avenue Northeast, Grand
10 Rapids, Michigan 49525.
11        I am a notary authorized to take
12 acknowledgments and administer oaths in the state of
13 Michigan.
14        Additionally, absent an objection on
15 the record before the witness -- witness is sworn, all
16 parties and the witness understand and agree that any
17 certified transcript produced from the recording of
18 this proceeding:
19     - is intended for all uses permitted
20       under applicable procedural and
21       evidentiary rules and laws in the
22       same manner as a deposition recorded
23       by stenographic means; and
24     - shall constitute written stipulation
25       of such.

Page 5

1        At this time will everyone in
2  attendance please identify yourself for the record,
3  beginning from my left.
4        MS. TEMPLE: Nancy Temple for
5  plaintiff, Amy Fox.
6        MS. BUCHANAN: Ellie Buchanan for
7  plaintiff, Amy Fox.
8        MR. WARREN: Richard Warren appearing
9  on behalf of Nexstar and for Charlsie Dewey.
10       MS. DEWEY: Charlsie Dewey, employee of
11 Nexstar.
12       THE REPORTER: All right. Thank you.
13 Hearing no objection I will now swear in the witness.
14       Please raise your right hand.
15 WHEREUPON,
16       CHARLSIE DEWEY,
17 called as a witness and having been first duly sworn
18 to tell the truth, the whole truth, and nothing but
19 the truth, was examined and testified as follows:
20       THE REPORTER: Thank you very much.
21       EXAMINATION
22 BY MS. BUCHANAN:
23    Q  Ms. Dewey, will you please state your name
24 for the record?
25    A  Yep. Charlsie Dewey.

2 (Pages 2 - 5)

Page 10

1  to be like unbiased in your reporting and making sure
2  that you're covering a story accurately.
3      Q   And would you say that was also the
4  objective at WOOD-TV 8?
5      A   Yes.
6      Q   Okay.  Now, I'm going to talk a little bit
7  about your role as digital director.
8      A   Okay.
9      Q   What is your role as digital director at
10 WOOD-TV 8?
11     A   I manage the web team so I have a group of
12 employees about I think there's 11 of them, 12 of
13 them, that I manage and we are in charge of all of the
14 online content.  So all the website content and the
15 social media for the station.  I have digital content
16 producers and digital reporters that report to me and
17 I also have a digital streaming anchor.  I had a web
18 developer.  He's not there anymore.  And I think
19 that's the key positions that I oversee.
20     Q   Okay.  So everyone who you oversee is within
21 your web team.
22     A   Yes.
23     Q   And who do you report to?
24     A   Julie Brinks, the GM.
25     Q   Is there anyone else you report to?

Page 11

1      A   No.
2      Q   Do you make editorial decisions in your role
3  as digital director?
4      A   Yeah.  For the web team, for the website.
5      Q   Will you tell me about that process?
6      A   Yeah.  I mean, it's -- occasionally, we'll
7  have questions about like should we use a certain
8  photo so like, to give you an example, we recently got
9  a photo from a viewer of a scene of an accident with
10 like probably a body underneath a tarp so we had to
11 decide if we wanted to publish that online or not, if
12 it was necessary to publish that.  What -- what is the
13 -- what does it add or what -- you know, kind of that
14 sensitivity of do we publish something like this or
15 not given that there's a body under it, a child's body
16 under there.
17         So that's the type of thing that usually I
18 get brought into those conversations.  Sometimes we'll
19 get a complaint and then we have to decide if we feel
20 like there's a reason to like take down an article.
21 We look to see if it's factually accurate, if there's
22 any factual errors, can we just correct them and add
23 an editor's note, if they -- even if -- even in some
24 cases where the article's 100 percent accurate, we
25 might occasionally decide that the like person who's

Page 12

1  complaining is being harmed by the article and it's
2  not necessary for us to keep the article up so we
3  might take it down, even if it is 100 percent factual,
4  there's nothing wrong with it, we don't have to.  And
5  those are kind of my decisions to make, whether or not
6  -- what we're going to do in those cases.
7          Of course, we do also have a standards team
8  at Nexstar so oftentimes, if I'm unsure or if I want a
9  second opinion, I will message them and say, "We have
10 a takedown request.  This is what the issue is.  This
11 is what I think.  What do you guys think?"  And then
12 they will advise me if they think differently than me
13 or if they agree with me or sometimes they'll disagree
14 with me and say, "No.  You need to take that down."
15 So the standards team is definitely like above me in
16 decision-making.
17     Q   Okay.  And who would be on that standards
18 team?
19     A   Oh, gosh, you'd have to -- I -- like I know
20 Stephen Doyle [ph], Jim Van Nostrand I think is his
21 last name, Susan Tully.  There might be other people,
22 but those -- Stephen and Jim are the two people I
23 interact with the most when I do takedowns.
24     Q   Okay.
25     A   And they're like, yeah, my key standard

Page 13

1  guys.
2      Q   Is there anyone else that you've had to work
3  with for standard takedowns other than those three
4  people you named?
5      A   I -- you know, like I said, there may be
6  other people on that team, but those are the three
7  that I -- that stick out to me.  So if I have, I don't
8  remember.
9      Q   Okay.  In your editorial decisions when
10 you're deciding whether to publish an article, are you
11 the ultimate decision-maker or does the team work
12 together to make that decision?
13     A   I would be the ultimate decision-maker, but
14 I'm definitely a collaborative manager and I do like
15 to take into account other people on my teams opinions
16 and, again, when you're looking at some of these
17 things are not black and white so you have to really
18 look at the gray area.  So I definitely take into
19 account other people's opinions on it, but it is
20 ultimately my decision 'cause I'm in the digital
21 director role.
22     Q   Okay.  And when you're getting other
23 people's opinions in a collaborative style, is it
24 through meetings?  Are you just having one-on-one
25 conversations with these people?  What is --

Page 30

1  A  Okay.
2  Q  Do you recall when you first heard of the
3  June 13, 2023, internal memo?
4  A  Yes.  When I was in Stanton's office and he
5  showed it to me.
6  Q  Do you recall when this was?
7  A  Sort of.  So I had been in a luncheon with
8  Carly, my co-worker.  And while we were at the
9  luncheon, I got either an email or text from Stanton
10  saying, "Hey, when you get back, can you come see me?"
11  So it would have been after the luncheon so I'm
12  guessing like one, 1:30-ish, two o'clock.  And then I
13  went down -- I pretty much put my stuff away, went
14  down and that's when he said that Julie had told him
15  to reach out to me and he started to -- he showed me
16  the memo and started to try to explain what was going
17  on.
18  Q  What is Carly's last name?
19  A  Munoz.
20  Q  Do you know why Julie asked Stan to reach
21  out to you?
22  A  Because I'm LGB -- I'm part of the LGBT
23  community and so she wanted me to I think take a look
24  and see what I thought of the memo and to talk to him
25  about -- about it.  But she wasn't there so I don't

Page 31

1  actually know.  I just think that probably needing
2  part of the LGBTQ community and a director of a
3  department was the reason.
4  Q  Tell me -- scratch that.  What was your
5  initial reaction when you read the memo in Stanton's
6  office.  Assuming that's the first time you read it.
7  A  It is the first time I read it.  I was -- I
8  was very taken aback and surprised.  I just was very
9  confused by it and trying to understand what prompted
10  it and why it was sent out and what -- what -- what
11  was the reason and rationale behind it.
12  Q  Can you tell me about this conversation you
13  had with Stanton right after reading the memo for the
14  first time?
15  A  Right.  I mean, it was -- it's hard to
16  remember 'cause it was two years ago so I don't
17  remember in detail, but like definitely he was trying
18  to explain why he had sent the memo and I was like
19  trying to understand what -- what the reasoning was
20  behind the memo.  I was trying to explain to him why
21  Pride festivals are, in fact, newsworthy.
22      We discussed the current climate around
23  LGBTQ issues and the political aspect of that.  We
24  talked about -- he talked about his concern about us
25  becoming the next target or the next Budweiser because

Page 32

1  that was when -- there was -- had been some backlash
2  against Target for their Pride displays and there had
3  been concern -- some backlash around Budweiser for a
4  trans spokesperson that they had brought on for Pride.
5  And he was very concerned that our station would
6  somehow be brought into this battle or this attack and
7  I was trying to explain that that didn't make any
8  sense because we are a news organization.  Just kind
9  of trying to educate him too on just the history of
10  Pride and the current climate around the LGBTQ
11  community.
12      So that's -- again, like the -- it -- I was
13  in there for I don't know how long.  I think we
14  covered a lot of ground, but I left feeling kind of
15  like he didn't -- I left feeling like he wasn't really
16  listening to me.  Like he was listening to check a
17  box, to be able to tell Julie that, yep, he talked to
18  me, but I didn't feel like he was really listening to
19  my concerns about the memo.  I didn't feel like he
20  really was that interested in deepening the coverage.
21  Like, for instance, in the memo he talks about being
22  more thoughtful I think about the coverage, but he
23  didn't seem like he actually wanted to be more
24  thoughtful at all.  It was pretty dismissive of
25  everything I was saying.

Page 33

1      And so, I left and I remember just being
2  like -- so he's on the ground floor and I'm on the
3  third floor.  And by the time I got to the third
4  floor, I just felt so unsatisfied with that
5  conversation and then so upset about the whole
6  situation that I just went straight into my co-worker
7  Casey's office and I was like, "Holy shit, like I have
8  to tell you about this."  And then at that point I --
9  neither of us had access to the memo because Stanton
10  hadn't sent it to any of the directors.  So we had to
11  text -- Casey texted one of our employees on one of
12  our staff and said, "Do you have -- can you forward us
13  this memo?"
14      And so then we go the staff member to
15  forward us the memo so that we could actually really
16  read it.  Because again, I felt very rushed in
17  Stanton's office.  He's like staring at me while I'm
18  trying to read this memo and take it all in.  So then
19  like I reread it and it was just like, "This is so
20  fucked up."  Sorry for my use of the words, but it was
21  very upsetting.  And so then I think we sat there and
22  just talked about it for a long time.  My other co-
23  worker came in, Carly, and the three of us sat around
24  talking about it.
25      And then I was like, "I just feel so upset

Page 34

1  about this. Do you think I should call -- do you
2  think I should get a hold of Julie?" And they both
3  said yes and I -- 'cause Julie was in Arizona and she
4  was dealing with her son's -- I think he was having
5  surgery so I was like hesitant to interrupt her, but
6  they were like -- encouraged me to reach out. And so
7  at that point I reached out to Julie and said --
8  talked to her about my concerns and how upset I was
9  and that I was very confused about why this memo had
10 gone out and Stanton's kind of dismissal of it.
11     Q  Were there any other explanations Stanton
12 gave you in this initial meeting with him other than
13 the Target/Budweiser?
14     A  Yeah. He's -- he said that one of the
15 reporters had been assigned to something on Saturday,
16 but she had heard about a Pride festival in some small
17 town and ended up going to report on that instead and
18 that they were upset that she had like I guess gone
19 and done her own thing instead of whatever assignment
20 they thought that she was going to do. And that's
21 when we discussed like -- he said -- I -- you know,
22 "We -- we don't need to cover every single Pride
23 festival."
24         And I said that to a point I agree, we don't
25 need to cover every single Pride festival, but I also

Page 35

1  was trying to explain to him why these Pride festivals
2  in these small towns are actually very newsworthy
3  because these are places that wouldn't have supported
4  a Pride festival at all for so long so the fact that
5  they are -- people are feeling confident and able to
6  do this in these towns is in and -- in and of itself
7  newsworthy but that I agreed that our coverage needed
8  to be more in-depth and that just covering Pride
9  festivals as an event is -- during Pride Month is sort
10 of a surface level approach.
11     Q  So you agreed with Stanton that coverage of
12 Pride festivals needed to be newsworthy and covered
13 in-depth. Correct?
14         MR. WARREN: Objection to
15 mischaracterization.
16         You can answer.
17         THE WITNESS: Yeah. So I would say
18 you're mischaracterizing what I'm saying. So Pride
19 festivals are, in fact, newsworthy because again,
20 historically, they have not been welcomed in many
21 communities. So the fact that people are feeling that
22 they are able to organize and be publicly in a space
23 and that they feel safe enough to do that is
24 newsworthy. But I do think that -- and -- and also,
25 the Grand Rapids Pride Festival, which has been going

Page 36

1  on for so long, has just grown so substantially it's
2  now I believe the largest single day event in Grand
3  Rapids. Single -- yeah, single day event in Grand
4  Rapids.
5          So that's huge. I mean, that's
6  newsworthy. We would cover, you know, any festival
7  that's that big would definitely be worth our coverage
8  and we go to much smaller festivals. So it's not that
9  I don't think Pride festivals are -- are newsworthy,
10 they are, but I think when you're covering Pride, you
11 need to think also beyond festivals. So I think, yes,
12 let's cover the festivals, let's cover some of the big
13 ones, let's cover some of the small ones, but then
14 let's also look at the people. Let's cover people
15 stories.
16         And that's what we do for Hispanic
17 Heritage. That's what we do for Black History. We're
18 not just covering their festivals. We're not just
19 covering their events. We're actually covering
20 stories about their lives. And so the fact that our
21 Pride coverage doesn't really look at the lives of the
22 people, it just looks at these events, that's what I'm
23 saying is kind of surface level.
24 BY MS. BUCHANAN:
25     Q  So in your opinion, was the Pride coverage

Page 37

1  that month so far, June of 2023, not covering people's
2  stories in some of the articles that were being
3  published or news --
4      A  I don't remember what we covered. I would
5  love a list of the stories that we covered. Yeah. I
6  don't know what stories we had done at that point.
7  Yeah. But coming from having worked at the Windy City
8  Times, I certainly probably had, and -- and also being
9  part of the community, I probably could have -- like
10 they should have come to me. I could have given them
11 many more ideas.
12     Q  Was it your understanding that Stanton knew
13 you were part of the LGBTQ Plus community before this?
14     A  Yeah. He did.
15     Q  Was it your understanding that Amy Fox knew
16 you were part of the LGBTQ Plus community before this?
17     A  I would assume. I've always been out and I
18 don't think anybody wouldn't know, but I also don't
19 come out to people like every -- I don't make a point
20 of coming out to everyone. I'm just out.
21     Q  And you don't recall a conversation with Amy
22 Fox where you spoke about being in the community?
23     A  Mm-mm.
24     Q  Is there anything else you remember from
25 that initial conversation with Stanton Tang?

10 (Pages 34 - 37)

Page 74

1  before so it's hard to know what's a fair timeframe,
2  but when you're like an employee of a company that's
3  being attacked and being like, you know, it was just
4  snowballing and there's no response for an entire day,
5  I think people were starting to feel like they wanted
6  to distance themselves.  They wanted to speak out and
7  the company wasn't doing it quickly and I think -- I
8  think that's just because you're in a corporation and
9  there's a lot of layers to that, but I think that's
10 why people started doing it.  Because I think people
11 started to feel like their reputations were being
12 dragged down and they weren't being able to respond
13 and so I think people just started doing it.
14         And as somebody that's part of the LGBTQ
15 community, certainly there was that part of me that's
16 like I need to, you know, I need to stand up, but I
17 also am a director of a department and I know that you
18 just really have to let things run their course and so
19 I need my job.
20    Q    What is your basis for believing tweets were
21 made because of a delayed response from Nexstar?
22    A    I think people kept asking about where's the
23 communication, what -- what can we put out, how are we
24 handling this and I don't think that there was a lot
25 of communication coming from the top down for people

Page 75

1  to know what was really going on.  There was already
2  this huge mistrust with Stanton still being there.
3  Some people were upset that nothing was being done --
4  I -- I -- I think things were being done, but I don't
5  think people were seeing what was being done and I
6  don't think it was being communicated.  And again,
7  some of these people are very public figures because
8  they're anchors and so their -- they're -- they're a
9  brand.  And their brands are being destroyed by this
10 memo and so I think they felt a strong sense that they
11 needed to speak out.
12    Q    Explain to me what you mean by they have a
13 brand as anchors.
14    A    I mean, the way that we are in the media
15 world today, I think anchors are more -- I think there
16 used to be a lot more like who you're affiliated with
17 probably way more than who you are and now I think who
18 you are is a lot bigger deal.  Like you can leave a
19 station and still have a big career if you have all
20 these followers.  You know, social media is so big
21 that media has really changed more to be -- I guess
22 I'd say rather than like station driven, more
23 individual driven.
24    Q    Do you believe that these individuals were
25 tied in the public arena to WOOD-TV 8?

Page 76

1         MR. WARREN:  Object.  Calls for
2  speculation.
3         You can answer.
4         THE WITNESS:  I mean, people know that
5  they work for Channel 8 so for WOOD-TV.  So they are
6  linked to WOOD-TV.  So if they're linked to something
7  bad or negative, then, yeah, it's going to influence
8  how people see them.  So I think they felt like that
9  they needed to stand up for what their personal belief
10 was on their personal, you know, personal professional
11 pages.  Like none of them did this on the WOOD-TV
12 page.
13 BY MS. BUCHANAN:
14    Q    Did the digital department issue a response
15 to the June 13, 2023, memo?
16    A    When we finally got the communication from
17 Nexstar, we -- I believe we published it.
18    Q    Was there ever consideration of either
19 taking down the article or making any factual
20 corrections to the article?
21    A    Which article?  The press release?
22    Q    Yes.
23         MR. WARREN:  Objection.  Lack of
24 foundation.
25         You can answer.

Page 77

1         THE WITNESS:  No.  Because that was
2  from corporate.  We weren't -- that was what we were
3  allowed to post.
4  BY MS. BUCHANAN:
5     Q    Did you do any investigation as to whether
6  the statement from Nexstar was truthful or accurate?
7     A    No.
8     Q    When did you learn about the four
9  terminations connected to the June 13th memo?
10    A    Rachel text -- sent me a text and said like
11 basically -- I don't know.  You -- you have the text.
12 She sent me a text that said, "Do you -- do you know
13 that this is happening?"  And I did not so that's when
14 I learned about it.
15    Q    What was your initial reaction when you
16 heard this from Rachel?
17    A    You -- you see right there?  I think I said<
18 "Holy -- holy shit," or "OMG."  I was shocked.  Like
19 it seemed like it had -- I mean, it felt like a long
20 time had passed from when the memo went out to that
21 actual day so I think I was starting to think it
22 wasn't going to happen and then --
23         MS. BUCHANAN:  Exhibit 47.
24         THE WITNESS:  -- it was --
25         MR. WARREN:  Thank you.

20 (Pages 74 - 77)

```
                                                        Page 82
 1         CERTIFICATE OF DEPOSITION OFFICER
 2         I, BRAD HALL, the officer before whom the
 3  foregoing proceedings were taken, do hereby certify
 4  that any witness(es) in the foregoing proceedings,
 5  prior to testifying, were duly sworn; that the
 6  proceedings were recorded by me and thereafter reduced
 7  to typewriting by a qualified transcriptionist; that
 8  said digital audio recording of said proceedings are a
 9  true and accurate record to the best of my knowledge,
10  skills, and ability; that I am neither counsel for,
11  related to, nor employed by any of the parties to the
12  action in which this was taken; and, further, that I
13  am not a relative or employee of any counsel or
14  attorney employed by the parties hereto, nor
15  financially or otherwise interested in the outcome of
16  this action.

17                       BRAD HALL
18                  Notary Public in and for the
19                     State of Michigan
20
21
22
23
24
25
```

```
                                                        Page 83
 1         CERTIFICATE OF TRANSCRIBER
 2         I, SANDRA HUANG, do hereby certify that this
 3  transcript was prepared from the digital audio
 4  recording of the foregoing proceeding, that said
 5  transcript is a true and accurate record of the
 6  proceedings to the best of my knowledge, skills, and
 7  ability; that I am neither counsel for, related to,
 8  nor employed by any of the parties to the action in
 9  which this was taken; and, further, that I am not a
10  relative or employee of any counsel or attorney
11  employed by the parties hereto, nor financially or
12  otherwise interested in the outcome of this action.
13
14
15                     SANDRA HUANG
16
17
18
19
20
21
22
23
24
25
```