UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMY FOX,

        Plaintiff,

                                        CASE NO. 1:24-cv-0614

v.

                                        HON. ROBERT J. JONKER

NEXSTAR MEDIA GROUP, INC.,

        Defendant.

_____/

STANTON TANG,

        Plaintiff,

                                        CASE NO. 1:24-cv-0614

v.

                                        HON. ROBERT J. JONKER

NEXSTAR MEDIA GROUP, INC.,

        Defendant.

_____/

**<ins>ORDER</ins>**

        These cases arise from the fallout over an internal memo that two senior news managers at WOOD-TV—Amy Fox and Stanton Tang—either wrote or approved regarding coverage of Pride-month events.  According to Fox and Tang, management initially agreed that the memo merely restated corporate policy, but after some colleagues misinterpreted the memo as being anti-gay—and after the memo was leaked externally—management allegedly shifted its stance and planted news stories that portrayed Fox and Tang as anti-gay.  The plaintiffs contend Nexstar did this to cause Fox and Tang to absorb the blame for the controversy while allowing the company to emerge unscathed.  Fox and Tang assert claims for defamation, false light, and violations of Michigan's Bullard–Plawecki Employee Right to Know Act (ERKA).  Nexstar moves for

summary judgment on all claims.

## BACKGROUND

### *The Memo*

In early June of 2023, Stanton Tang began to feel concerned about WOOD-TV's coverage of Pride-related events. (Stanton Tang Dep., 1:24-cv-0614, ECF No. 83-7, PageID.1145). To him, it seemed that the newsroom's approach to Pride coverage differed from its approach to coverage of other events, such as women's history month or black history month. (*Id.* at PageID.1146). As Tang tells it, when it came to the latter events, the newsroom tried to approach coverage in a unified way, to ensure that coverage was diversified, newsworthy, and spread throughout the month. (*Id.* at PageID.1146–1149). However, when it came to Pride events, the newsroom was deviating from its typical editorial review process, and many reporters were beginning to go cover stories about Pride festivals as soon as they heard that the event was taking place—without discussing with the rest of the newsroom whether the story ought to be covered, whether it was duplicative of another story that had recently aired, or whether some unique aspect of the story could be explored in a way that highlighted the story's overall newsworthiness. (*Id.*; *see also* Julie Brinks Dep., 1:24-cv-0614, ECF No. 83-4, PageID.1106). Tang was also worried that the volume of Pride stories being covered by WOOD-TV news staff was alienating some of the station's more conservative viewers. (Amy Fox Dep., 1:24-cv-0614, ECF No. 83-5, PageID.1127–1128).

On the morning of June 13, 2023, Tang shared his concerns with his Assistant News Director, Amy Fox. (*Id.*). He explained that he wanted to ensure that any Pride-related reporting included appropriate historical context and that the newsroom was approaching the topic consistently. (*Id.*). To address these concerns, he asked Fox to draft an email to the newsroom. (*Id.* at PageID.1128). Fox did so and then shared her proposed email with Tang. (*Id.*). Tang added

2

a few more lines to the email—including a directive for reporters to "get both sides of the issue" when covering Pride events—and told Fox to send the memo to all staff, which she did. (*Id.*).

### Internal Reactions

The memo was not well received. (Julie Brinks Dep., 1:24-cv-0614, ECF No. 83-4, PageID.1105). Shortly after Fox sent it, employees at WOOD-TV began to make it known that they disagreed with its contents. (*Id.*). One of the most vocal of the frustrated employees was Luke Stier, an executive producer at the news station. (*Id.*). As Fox describes it, once Stier read the memo, he immediately sought her out to express his feelings, and it was apparent to Fox that he was "very upset" and "very angry." (Amy Fox Dep., 1:24-cv-0614, ECF No. 83-5, PageID.1126). Other employees also reported feeling offended by the memo, and one of WOOD-TV's other senior managers reported thinking, "this is so f**ked up" when he first read it. (Def.'s Mot. Summ. J., 1:24-cv-0614, ECF No. 74, PageID.460).

After Stier finished talking with Amy, he forwarded the memo to a former WOOD-TV news director, Dan Boers, who was then working for one of WOOD-TV's direct competitors, WXMI. (Julie Brinks Dep., 1:24-cv-0614, ECF No. 83-4, at PageID.1110). Stier also called WOOD-TV's general manager, Julie Brinks, who had unexpectedly needed to leave the state to deal with a family member's medical emergency. (*Id.* at PageID.1105; PageID.1112). Stier informed Brinks that the news staff were very upset about the memo. (*Id.* at PageID.1105).

Brinks listened to Stier's concerns and then contacted Fox and Tang. (*Id.* at PageID.1105). She learned that a meeting was scheduled for that afternoon with the entire newsroom and that members of the news staff had requested that a member from human resources be present at the meeting. (*Id.* at PageID.1106–05). Brinks then began emailing back and forth with Fox and Tang. (*Id.* at PageID.1105–07). She told them that she had reviewed the memo and that she "did not

3

understand how any of this is discriminating against anyone." (*Id.* at 1107).  She also asked Tang

to provide her with a list of the Pride-related stories the station had aired so far that month, and she

tried to advise Tang on how to present himself at the meeting that afternoon.  (*Id.* at 1109).

Specifically, she told Tang "to listen, consider and make sure that we all understand that our job

is to select and cover all news in a newsworthy way." (*Id.*).

At the meeting itself, Fox apologized for the way the memo had been received.  (*Id.* at

1110).  She explained that her intent had not been to suggest the station should stop covering Pride

events but rather to ensure that the newsroom was discussing those events substantively rather than

merely announcing that they were occurring.  (*Id.*).  After the meeting, four newsroom leaders—

Tang, Fox, Linda Nickisch-Phelps, and Brinks (by phone)—met to discuss the situation, and both

Nickisch-Phelps and Brinks reiterated that they believed the newsroom was misinterpreting the

memo and that nothing in it was discriminatory.  (*Id.* at 1131).

### *Management's Response to the Public Controversy*

Over the next two days, news about the memo continued to spread throughout the media.

(Def.'s Mot. Summ. J., 1:24-cv-0614, ECF No. 74, PageID.461).  WXMI—the organization with

which Stier had shared a copy of the memo—ran its own story, as did many other news

organizations.  (*Id.*).  The story also began to spread rapidly on social media.  (*Id.* at PageID.463).

Brinks was told during this time to begin compiling lists of all the news stories she learned about

that touched on the issue, and Nexstar's communications director, Gary Weitman, began preparing

an official statement.  (Julie Brinks Dep., 1:24-cv-0614, ECF No.83-4, PageID.1112–13).

While Weitman was still preparing his statement, a reporter from CNN—Liam Reilly—

reached out to him to ask about the situation.  (Emails Between Gary Weitman and Liam Reilly,

1:24-cv-0614, ECF No. 82-8, PageID.832).  Specifically, Reilly asked Weitman to confirm

whether Fox really had sent out a memo instructing news staff to "cover fewer Pride events because the stories have been upsetting the station's largely conservative audience." (*Id.*).  Reilly also wanted to know whether Fox had acted at the direction of WOOD-TV or Nexstar, whether the memo resulted from a meeting, whether anyone else had been consulted before the memo was sent out, and whether staff at Nexstar or WOOD-TV had reacted negatively. (*Id.*).

Weitman responded to Reilly by sharing the official communication that he had written, which had been approved by other members of Nexstar's corporate leadership team. (*Id.* at PageID.831). The statement read:

> Diversity, equity, and inclusion are among Nexstar's core values. Our local TV stations are expected to cover and report the news of the day in an expansive and inclusive fashion, consistent with these values. We're looking into the situation at WOOD-TV, as the communication regarding the station's coverage of PRIDE month activities in the area is not consistent with Nexstar's values, the way we cover the news, or the respect we have for our viewers. We will take appropriate action as necessary to address this situation, and apologize for offending members of the LGBTQ community and WOOD-TV's viewers.

(*Id.*).  That same evening, Weitman also sent the official communication to Stier, who had contacted him to ask for a statement from Nexstar regarding the memo. (Email from Luke Stier, 1:24-cv-0614, ECF No. 82-32, PageID.1017). Within an hour, Stier had posted a story on WOOD-TV's website that contained Nexstar's official communication and that also stated that WOOD-TV news staff had been told that the two news directors responsible for the memo would no longer be involved in decisions related to coverage of Pride events. (*Id.*).

Around 1:00 am the next morning, Julie Brinks sent an email to the department head team to let them know that she had received an official statement from Nexstar's communications team that could be shared with the press and members of the community. (Julie Brinks Dep., 1:24-cv-0614, ECF No. 83-4, PageID.1116). She also indicated that the statement was going to be released to the rest of the news staff at 8:30 am. (*Id.*). Because Brinks was still traveling due

to a family emergency, she could not meet with any of the department heads in person, but she offered to make herself available at 8:00 am via video conference in case any of the department heads wanted to discuss the statement.  (*Id.*).

At 6:54 am, Tang responded to Brinks' email to note his objection to the statement.  (*Id.*). Tang felt that it was inaccurate to say that the memo did not reflect Nexstar's values or the way Nexstar presents the news.  (*Id.*).  To support his objections, Tang quoted from Nexstar's journalistic integrity principles:  "We present all points of view.  We reach out to the subjects or stakeholders of a story.  We put our personal biases aside to approach the topics we cover with balance.  Nexstar journalists at all levels should refrain from political activity.  Impartiality leads to trust."  (*Id.* at 1116–17).

### *Management Moves Against Fox and Tang*

Over the next two weeks, Cortney Williams and Theresa Underwood—respectively, the vice president of human resources and the regional vice president for the region in which WOOD-TV is located—traveled to Grand Rapids to conduct an investigation regarding the memo. (Courtney Williams Dep., 1:24-cv-0614, ECF No. 83-11, PageID.1191).  As part of their investigation, they interviewed most members of the news staff at WOOD-TV.  (*Id.*; *see also* Email from Theresa Underwood, 1:24-cv-0614, ECF No. 82-39).  After the investigation had concluded, Williams and Underwood recommended that Fox and Tang be terminated because they had "lost the confidence" of the news team and because they had "violat[ed] the standards of journalism by letting their personal views impact their guidance on news coverage."  (Email from Courtney Williams, 1:24-cv-0614, ECF 82-40, PageID.1058).  They also recommended that Stier and one other employee be fired for speaking on behalf of WOOD-TV without permission to do so and for sharing the memo with outside news organizations.  (*Id.* at PageID.1059).

On June 29, all four employees were terminated.  (Julie Brinks Dep., 1:24-cv-0614, ECF No. 83-4, PageID.1108).  News of their terminations spread rapidly on social media.  (Emails Between Gary Weitman and Liam Reilly, 1:24-cv-0614, ECF No. 82-8, PageID.830).  That evening, Reilly—the CNN reporter who had previously communicated with Weitman about the memo—reached back out to Weitman to ask if it was true that multiple WOOD-TV employees had been fired in connection with the memo.  (*Id.*).  In response, Weitman shared a second official communication he had written:

> We can confirm that WOOD-TV made changes to its newsroom leadership team to ensure its ability to continue providing outstanding local news coverage and service to the Grand Rapids community and surrounding area.  As these are internal personnel decisions involving matters of personal privacy, we will decline further comment.

(*Id.* at PageID.829).

Reilly then emailed back, specifically to ask whether Fox and Tang were still employed by WOOD-TV or Nexstar in any capacity.  (*Id.*).  To this, Weitman said, "Not attributable to me, WOOD or Nexstar, they are no longer with the station. You can say a source with knowledge of the situation or something like that."  (*Id.*).  Once more, Reilly responded seeking clarification: "Can you confirm whether this is a result of the investigation into the memo?" (*Id.*).  And Weitman responded, "I think that's a fair assumption . . . but again not attributable."  (*Id.* at PageID.828).

The next day, CNN ran an article under the title "News directors at Michigan TV station ousted after telling staff to 'get both sides' of Pride coverage."  (Email from Theresa Underwood, 1:24-cv-0614, ECF No. 82-5, PageID.799).  The article identified Fox and Tang by name and indicated that they had been "ousted" in connection with the memo.  (*Id.* at PageID.800).  The article also incorporated the official statements that Weitman had provided to Reilly, including the statement that the memo was "not consistent with Nexstar's values" and the statement that the

terminations were necessary in order to ensure Nexstar's "ability to continue providing outstanding local news coverage and service to the Grand Rapids community and surrounding area." (*Id.*).

Within fifteen minutes of the CNN story being published, Theresa Underwood had forwarded a copy of it to Gary Weitman and other members of the Nexstar corporate leadership team. (*Id.* at PageID.799). Weitman responded by saying, "I think the CNN story is fine." (*Id.*). In a follow-up email, he added, "[M]ost of the focus seems to be connecting the ND and Asst ND with the memo as the reason for the firings. That's a good thing." (*Id.* at PageId.797).

## DISCUSSION

Nexstar has moved for summary judgment on all of Fox and Tang's claims. "Summary judgment is appropriate when there is 'no genuine dispute as to any material fact' and the moving party 'is entitled to judgment as a matter of law." *F.P. Dev., LLC v. Charter Twp. of Canton*, 16 F.4th 198, 203 (6th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is material "if its resolution will affect the outcome of the lawsuit." *Id.* In deciding a motion for summary judgment, "[a]ll factual inferences 'must be viewed in the light most favorable to the party opposing the motion.'" *Cehrs v. Ne. Ohio Alzheimer's Rsch. Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)). In supporting their arguments either for or against summary judgment, parties may point to any "materials in the record." Fed. R. Civ. P. 56(c)(1)(A).

## I.    The Defamation Claims

The Court turns first to Nexstar's motion for summary judgment with respect to the defamation claims. To prevail on their defamation claims, the plaintiffs would need to prove four elements:

8

(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication.

*Smith v. Anonymous Joint Enter.*, 793 N.W.2d 533, 540 (Mich. 2010) (quoting *Mitan v. Campbell*, 706 N.W.2d 420, 421 (Mich. 2005).

Nexstar argues that it is entitled to summary judgment on the plaintiffs' defamation claims because the plaintiffs have been unable to point to any statements made by Nexstar about the plaintiffs that are false.  (Def.'s Mot. Summ. J., 1:24-cv-0614, ECF No. 74, PageID.468; Def.'s Mot. Summ. J., 1:24-cv-0616, ECF No. 56, PageID.338).  Nexstar's theory seems to be that the only potentially untrue statement that the plaintiffs can point to is Nexstar's statement that "the communication regarding the station's coverage of PRIDE month activities in the area is not consistent with Nexstar's values, the way we cover the news, or the respect we have for our viewers."  (*See* Def.'s Mot. Summ. J., 1:24-cv-0614, ECF No. 74, PageID.471).  However, according to Nexstar, there is no question about the truthfulness of this statement because Nexstar's corporate leadership team is the only group of people that can define what Nexstar's values are and because that leadership team has concluded that the memo was not in line with those values.  (Def.'s Mot. Summ. J., 1:24-cv-0614, ECF No. 74, PageID.472; Def.'s Mot. Summ. J., 1:24-cv-0616, ECF No. 56, PageID.338).  Therefore, Plaintiffs cannot prove an essential element of their defamation claims.

There are two problems with this theory.  First, the record contains evidence from which a reasonable jury could conclude that some members of Nexstar's leadership team *did* believe the memo aligned with Nexstar's values.  Most significantly, Julie Brinks—the plaintiffs' direct manager—indicated numerous times that she believed the memo was in line with Nexstar's

9

journalistic standards, that it did not discriminate against anyone, and that it was being misinterpreted by some members of the news staff.  (*See, e.g.*, Julie Brinks Dep., 1:24-cv-0614, ECF No. 83-4, PageID.1107, 1114, and 1116–17).   Because Julie Brinks was the person responsible for conveying to the plaintiffs how WOOD-TV was supposed to report the news, a reasonable jury could find her beliefs about the memo and about Nexstar's values and policies especially relevant concerning the question of the statement's truthfulness.

More importantly, though, Nexstar's argument is also flawed because Nexstar fails to recognize that, under Michigan law, a literally true statement can still be actionable.  *See Hawkins v. Mercy Health Servs., Inc.*, 583 N.W.2d 725, 732 (Mich. App. 1998).  Often, two true statements can be juxtaposed in such a way that they imply an idea that is false, which, under Michigan law, gives rise to a cause of action for defamation.  *See, e.g.*, *Reighard v. ESPN, Inc.*, 991 N.W.2d 803, 811 (Mich. App. 2022).  *Reighard* offers a good example of how this type of defamation—often referred to as "defamation by implication"—typically occurs.

The plaintiff in *Reighard* was the head coach of the women's gymnastics team at Central Michigan University.  *Id.* at 807.  On February 20, 2019, the university announced that Reighard had been placed on leave and that an investigation was under way.  *Id.*  The university did not provide any details about the investigation or the reason for Reighard's leave.  *Id.*  Still, an ESPN reporter who had previously authored a book about the Larry Nassar sex-abuse scandal tweeted about the university's announcement in a two-part twitter post.  *Id.*  The reporter's first tweet read:

> Michigan's attorney general announced today her office is taking over an investigation of John Geddert, the 2012 Olympic team head coach and close friend of Larry Nassar.  Several gymnasts have publicly abused [sic] Geddert of physically and mentally harming them.

*Id.*  And his second tweet read:

> On the same day as the AG's announcement, Central Michigan said it was putting

10

> longtime gymnastics coach Jerry Reighard on leave amid an internal review.  No details of the review were shared, but Reighard has a long personal and professional relationship with Geddert.

*Id.*  Read together, the obvious message implied by the tweets is that Reighard was placed on leave in connection with the Nassar scandal.  *Id.* at 812.  Because every statement contained in each tweet was literally true, however, the reporter saw no need for a retraction.  *Id.*  So Reighard sued for defamation.  *Id.* at 806.

The reporter moved for summary judgment.  *Id.* at 809.  Concluding that the tweets themselves were substantially true, the trial court granted the defendant's motion.  *Id.*  On appeal, the appellate court reversed.  *Id.* at 815.  The appellate court held that the trial court had erred by considering the truthfulness of each statement in isolation rather than the truthfulness of the implication that arose when the statements were read together.  *Id.*  Because a reasonable jury could have found the tweets' implication—which is that there was a connection between Reighard's administrative leave and the Nassar scandal—to be both false and defamatory, the appellate court held that the claims should have been allowed to proceed to trial.  *Id.* at 815.

The same principle is on display in *Hawkins*.  In that case, the plaintiff worked as a nurse in the intensive care unit of a hospital.  583 N.W.2d at 726.  During one of her shifts, there was a miscommunication about the proper dose of medicine to give to a patient, and the patient ended up dying as a result.  *Id.* at 727.  After it became apparent that the patient received the wrong dose, Hawkins began talking loudly with two other nurses about the care the patient had been receiving.  *Id.*  Specifically, Hawkins began criticizing the doctor in charge of the patient's care.  *Id.*  That conversation was overheard by the patient's family members, who reported it to hospital staff.  *Id.* The hospital administration investigated the reported behavior by separately interviewing all three nurses allegedly involved.  *Id.*  During the interviews, two of the nurses admitted that the

11

conversations had taken place, but Hawkins denied having ever spoken poorly about the doctor. *Id.*  The hospital terminated Hawkins for lying about the conversation.  *Id.*

In the days that followed, the media began to report about the patient's death.  *Id.* at 728. In particular, the media wanted to know if the hospital was investigating the issue or whether any disciplinary actions had been taken.  *Id.*  In response to this pressure, the hospital issued two press releases.  *Id.*  The first press release stated that "[w]hile the patient was being cared for by two registered nurses and a physician, there appears to have been an inappropriate dosage of medication administered."  *Id.*  It also reported that the patient had died.  *Id.*  The second press release stated that the hospital had "instituted disciplinary action" and that, as a result, "one employee is no longer with the hospital."  *Id.*  The implication of these two press releases, Hawkins argued, is that she was terminated for providing incompetent care to a patient.  *Id.* at 731.  And the Court of Appeals agreed.  *Id.*  It held that a reasonable jury could have found that the implication of the hospital's statements was false even though each part of the statements—taken literally— was, in fact, true.  *Id.*  Therefore, it was inappropriate for the trial court to have granted summary judgment to the defendants.  *Id.* at 735.

In addition to illustrating the principles underlying a defamation-by-implication claim, *Hawkins* also touches on another issue that is central to this case: the potential for employers to deflect bad publicity by casting blame on a scapegoated employee during a scandal.  In *Hawkins*, the hospital was facing intense public scrutiny once it became known that a patient had died after receiving the incorrect dose of medicine.  *Id* at 728.  To address that scrutiny, a team consisting of the "the chief executive officer, the chief operating officer, the director of community relations, the risk manager, the director of critical care, the attorney for the hospital, and several members of a public relations firm hired by the hospital" worked together to create a press release that would

12

imply that the hospital had responded to the death by firing the employee who was responsible for it.  *Id.*  Outside of that goal, there is no other logical reason to have included details about Hawkins's termination alongside a press release that was otherwise meant to address the patient's accidental death.

The case at hand bears noteworthy similarities to *Hawkins*.  In both cases, the plaintiffs were former employees who alleged that their former employer had defamed them, and in both cases, the result of the defamation was that the company's brand was shielded from harm in the midst of public controversy.  Moreover, in both cases, the defamatory statement occurred not because anything the respective employers published was literally untrue, but because of the implication that arose when two statements were placed alongside one another.

In the case at hand, Nexstar's first official statement indicated that the Pride-coverage memo was not consistent with Nexstar's values and that Nexstar would be "taking appropriate action as necessary to address the situation."  (Emails Between Gary Weitman and Liam Reilly, 1:24-cv-0614, ECF No. 82-8, PageID.831).  The second official statement said that Nexstar made changes to the WOOD-TV newsroom leadership team in order to continue providing "outstanding local news coverage."  (*Id.* at PageID.829).  And when a reporter from CNN reached out to ask Weitman whether Fox and Tang, specifically, had been fired as "a result of the investigation into the memo," Weitman responded by saying, "I think that's a fair assumption . . . but again not attributable."  (*Id.* at PagedID.828–830).  Weitman later confirmed that it was a "good thing" that CNN was connecting the memo to the terminations of Fox and Tang.  (Email from Theresa Underwood, 1:24-cv-0614, ECF No. 82-5, PageID.797).  Based on this evidence, a reasonable jury could reach the conclusion that Nexstar was deliberately spreading the message that Fox and Tang are anti-gay in order to deflect public outrage away from the company and towards Fox and Tang.

Of course, whether the evidence in the case at hand is actually sufficient to establish that Nexstar *did* defame Fox and Tang in an attempt to protect its own brand is a question of fact for the jury to decide. *Osborn v. Knights of Columbus*, 401 F. Supp. 2d 822, 828 (N.D. Ohio 2005). The Court's only role, at this stage, is to determine whether a reasonable jury could return a verdict for Fox and Tang on this record. *Anderson*, 477 U.S. at 250. Having reviewed the record, the Court concludes that a reasonable jury could return such a verdict with respect to the defamation claims. Therefore, the Court will deny Nexstar's motion for summary judgment with respect to those claims.

## II. The Defamation Per Se Claims

Nexstar also seeks summary judgment on Tang's defamation per se claim. (Def.'s Mot. Summ. J., 1:24-cv-0616, ECF No. 56, PageID.347). As Nexstar correctly points out, this cause of action is an especially narrow one. *Daneshvar v. Kipke*, 266 F. Supp. 3d 1031, 1055 (E.D. Mich. 2017), *aff'd*, 749 F. App'x 986 (Fed. Cir. 2018). "[A]t common law defamation per se typically concerns issues of chastity, commission of a crime[,] loathsome disease, or disparagement of one's profession or business." *Id.* (quoting *Nehls v. Hillsdale Coll.*, 65 Fed. Appx. 984, 990–91 (6th Cir. 2003)). However, when Michigan codified its defamation torts, it listed only two torts for which presumed damages were recoverable: allegations of a crime and allegations imputing a lack of chastity. *See* MCL 600.2911(1). For all other damages, the plaintiff must show actual damages. *See* MCL 600.2911(2)(a). The implication of this is that, in Michigan, statements about one's profession or business no longer qualify as defamation per se. *See George v. Senate Democratic Fund*, No. 253202, 2005 WL 1027107, at *2 (Mich. Ct. App. May 3, 2005) (reaching that conclusion); *see also Daneshvar*, 266 F. Supp. 3d at 1055 (discussing the effect of the codification on statements impugning one's profession); *Heike v. Guevara*, 654 F. Supp. 2d 658,

14

676 (E.D. Mich. 2009) (same).

Here, Tang's defamation claims rest solely on the assertion that Defendant made untrue remarks criticizing his professional reputation. He has not suggested that the challenged statements called into question his chastity or accused him of criminal conduct—and those are the only two categories of statements that qualify for treatment as defamation per se under Michigan law. Because the governing precedent limits per se liability to those narrow situations, his per se theories cannot proceed. Nexstar is thus entitled to summary judgment on those claims.

## III.    The False Light Claims

The Court turns now to Plaintiffs' false light claims. In Michigan, to prevail on a claim for false light, a plaintiff must demonstrate that the defendant shared information with a wide audience and that this disclosure created a misleading impression by assigning to the plaintiff traits, actions, or views that were untrue and that would be highly offensive to a reasonable person. *Puetz v. Spectrum Health Hosps.*, 919 N.W.2d 439, 448–49 (Mich. App. 2018). Additionally, the plaintiff must show that the defendant knew of or acted with reckless disregard of "the falsity of the publicized matter and the false light in which the plaintiff would be placed." *Id.* (quoting *Detroit Free Press, Inc., v. Oakland Co. Sheriff*, 418 N.W.2d 124, 128 (Mich. App. 1987).

Nexstar argues that Plaintiffs' false light claims fail for the same reasons that their defamation claims fail: namely, because Plaintiffs cannot demonstrate the falsity of any statements made by Nexstar. (Def.'s Mot. Summ. J., 1:24-cv-0614, ECF No. 74, PageID.478; Def.'s Mot. Summ. J., 1:24-cv-0616, ECF No. 56, PageID.349). As discussed above, though, the evidence in the record is such that a reasonable jury could find that the statements made by Nexstar are actionable. Therefore, it is inaccurate to say that the false light claims must fail for inability to identify actionable false statements that Nexstar made about the plaintiffs.

Additionally, Nexstar argues that there is no evidence in the record suggesting that Nexstar acted recklessly with regard to the falsity of the statements or the false light in which the statements would place the plaintiffs. (Def.'s Mot. Summ. J., 1:24-cv-0614, ECF No. 74). In fact, Nexstar argues, the evidence in the record suggests the exact opposite. (*Id.*). According to Nexstar, Gary Weitman intentionally did not include either Fox's name or Tang's name in any of the statements Nexstar shared with the public regarding the Pride-Memo controversy. (*Id.* ("If there were any doubt as to Nexstar's intentions, Weitman confirmed his commitment to maintaining Fox's privacy a multitude of times throughout his deposition: 'We did not identify people, and that was by design in order to protect their privacy while the investigation moved forward.'" (quoting Weitman Dep., 1:24-cv-0614, ECF No. 83-10, PageID.1176))).

The Court concludes that a reasonable jury could find for either side on the question of recklessness. The record does contain some support for Nexstar's claim that it was trying to protect Fox's and Tang's reputations by not including their names in any of the public statements it released regarding the controversy. Perhaps a jury will find that support to be substantial enough to side with Nexstar. But the record does not unequivocally support the idea that Nexstar's motive in withholding the names was to protect Fox's or Tang's reputations. To the contrary, Weitman confirmed to Reilly that Fox and Tang were fired in connection with Nexstar's investigation of the memo. While he did not want to be identified as the source, his email exchanges indicate that he was pleased to see that Fox and Tang were bearing the brunt of the public's anger. A reasonable jury could conclude that Nexstar was deliberately sharing information with journalists precisely to cast Fox and Tang in a false light so that they could serve as a scapegoat for the controversy. Therefore, the Court will deny Nexstar's motion for summary judgment with respect to the false light claims as well.

16

**IV.    The ERKA Claims**

Finally, the Court turns to the claims based on violations of MCL § 4231.501 et seq.  (*See* Def.'s Mot. Summ. J., 1:24-cv-0614, ECF No. 74, PageID.480; Def.'s Mot. Summ. J., 1:24-cv-0616, ECF No. 56, PageID.350).  ERKA claims are predicated on Michigan statutes that, among other things, make it unlawful to "divulge a disciplinary report, letter of reprimand, or other disciplinary action to a third party" without first providing the employee with written notice that such information is being shared.  MCL §§ 423.505–06.  According to Plaintiffs, Nexstar violated the ERKA by notifying third-party news outlets about disciplinary action that was being taken against Fox and Tang without first notifying them of such disclosures.  (Pl.'s Resp. to Def.'s Mot. Summ. J., 1:24-cv-0614, ECF No. 83, PageID.1095; Pl.'s Resp. to Def.'s Mot. Summ. J., 1:24-cv-0616, ECF No. 62, PageID.575).

Nexstar argues that it is entitled to summary judgment on Plaintiffs' ERKA claims because the information that Weitman disclosed to third-party news outlets was not the type of information contemplated by the act.  (Def.'s Mot. Summ. J., 1:24-cv-0614, ECF No. 74, PageID.479).  Specifically, Nexstar argues that summary judgment is appropriate because Weitman did not affirmatively state that Fox or Tang had been fired due to Nexstar's investigation of the memo and because the information that Weitman *did* divulge was already public knowledge.  (*Id.* at PageID.480).  To support its argument that these types of disclosures do not lead to liability under the ERKA, Nexstar relies on two cases—*Scuderi v. Monumental Life Insurance Company*, 344 F. Supp. 2d 584, 605 (E.D. Mich. Nov. 9), and *McManamon v. Redford Charter Township*, 273 Mich. App. 131, 136 (2006)—neither of which supports the propositions Nexstar suggests.

In *Scuderi*, the plaintiff had been terminated because her supervisor concluded that she had improperly altered an applicant's pre-employment test.  *Scuderi*, 344 F. Supp. 2d at 590.  After her

17

termination, she twice requested a copy of her personnel file under the ERKA, but the employer did not send the file until several weeks later. *Id.*  The plaintiff sued, alleging that the delay violated the ERKA.  *Id.*  The court granted summary judgment to the employer because the plaintiff failed to show that the delay caused her any prejudice and because the only information disclosed by anyone was that the employee did not have a "spotless record."  *Id.* at 605–05.  Thus, in *Scuderi*, the court never had an opportunity to address what constitutes "divulging" information under the ERKA or whether confirming an employee's termination to the media violates the statute.

And *McManamon* is of equally little help to Nexstar.  In that case, a township supervisor told a newspaper that the plaintiff had been suspended and that his performance issues extended beyond the criminal charges already known to the public.  730 N.W.2d at 761.  The Court of Appeals held that this statement did constitute divulging a "disciplinary action" under the ERKA and that the employer violated the statute by failing to provide the employee notice before speaking to the press.  *Id.* at 761–62.  Although the court explained that the word "divulge" means to reveal "something private, secret, or previously unknown," it went on to reject the township's argument that the disclosure was permissible because the public already knew much of the underlying information.  *Id.* at 761.  Therefore, although the dicta in *McManamon* does seem to suggest that an employer cannot violate the ERKA by disclosing information that is already public knowledge, the case itself confirms that an employer *does* violate the ERKA when it confirms or elaborates on disciplinary action to the media without providing notice.  *Id.* at 762.

Here, Weitman was directly asked about Fox and Tang by name and confirmed both their terminations and suggested that the terminations were connected to Nexstar's internal investigation.  At the time, the only "public" information about Fox and Tang's terminations consisted of unverified social-media rumors.  Weitman's confirmation to CNN transformed those

rumors into an authoritative news story.   Under *McManamon*, that is precisely the type of disclosure that triggers the ERKA's notice requirement.   Therefore, because Weitman divulged that information to the press without first providing notice as required by the ERKA, a reasonable jury could conclude that Nexstar violated the act.   Thus, the Court will deny Nexstar's motion for summary judgment with respect to the ERKA claims as well.

## CONCLUSION

Accordingly, Nexstar's motion for summary judgment is **GRANTED** with respect to Tang's defamation per se claims.   With respect to all other claims, the motions for summary judgment are **DENIED**.

**IT IS SO ORDERED.**


Dated: <u>March 17, 2026</u>                     <u>/s/ Robert J. Jonker</u>
ROBERT J. JONKER
UNITED STATES DISTRICT JUDGE